No. 87,349

STATE OF KANSAS, *Appellee*, v. ROBERT KEITH CORDRAY, *Appellant*.

(82 P.3d 503)

Opinion filed January 16, 2004.

*Libby K. Snider*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Marc Goodman*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Robert Cordray was found guilty by a jury of one count of reckless second-degree murder and two counts of attempted reckless second-degree murder. He was sentenced to 109 months' imprisonment. Cordray appealed his convictions. In *State v. Cordray*, No. 87,349, unpublished opinion filed March 14, 2003, the Court of Appeals affirmed the conviction of reckless second-degree murder but reversed the convictions of attempted reckless second-degree murder, which is not recognized as an offense by Kansas courts based on *State v. Shannon*, 258 Kan. 425, 429, 905 P.2d 649 (1995). This court granted Cordray's petition for review of all remaining issues under Supreme Court Rule 8.03(g)(1) (2003 Kan. Ct. R. Annot. 58).

Cordray did not include "a short statement of relevant facts" in his petition for review, as is permitted by Supreme Court Rule 8.03 (a)(5)(d) (2003 Kan. Ct. R. Annot. 59). Thus, we may treat the facts in the opinion of the Court of Appeals as correctly stated. Here are the facts as set out in the Court of Appeals' opinion:

"In 1997, Cordray purchased an abandoned missile silo. Cordray was plagued by vandalism and theft. On the morning of February 16, 2000, Kristen, Cordray's daughter, reported that there was a car parked at the bottom of their driveway. Cordray and his family drove towards the car to inquire why it was there. As soon as Cordray passed the gate, the car 'took off at an extremely high rate of speed' and a beer can went 'flying out' of the car window.

"Cordray followed the car and got the license plate number. When Cordray caught up to the car and it stopped, he approached the driver and told him that he was going to report his license plate number to the authorities. This statement was met with a string of obscenities. The driver would not give Cordray his name. Cordray told the driver to stay away from his property.

"Cordray attempted to reach into the car and turn off the ignition. Mary, Cordray's wife, testified that the driver of the car told Cordray there would 'be trouble' if the Cordrays reported his license plate number to the authorities. Cordray believed that the driver and passenger were under the influence of drugs.

"When Cordray and Mary returned home, they called the authorities to report the incident. Jeffrey Hughey, the driver of the car, testified that he picked up his friend James Lyles and drove to the missile silo. Hughey said that he did not go past the 'no trespassing' sign. Hughey and Lyles admitted that they were drinking beer.

"Hughey testified that as he left Cordray's property, Cordray's truck followed him very closely. Hughey testified that after he stopped his car, Cordray tried to pull him out of the car. Hughey admitted that he argued with Cordray. Hughey then testified that Cordray told him he 'shouldn't come out again and if we did there would be two dead bodies in his driveway.' Lyles' testimony mirrored that of Hughey.

"Later that evening, while driving to his home, Cordray was passed by a red truck going up the road towards his residence. Cordray sat in the car and watched the truck inch forward with its lights off. Cordray could hear the truck's occupants yelling, although he could not make out what was being said. The truck left abruptly. Cordray followed the truck but was only able to get a partial license plate number. As soon as Cordray returned home, he directed Mary to call the sheriff. Cordray went outside, where he saw a 'light coming up the gravel road at high speed.' Cordray stayed at the gate and heard several cars approach his property.

"Cordray testified that he heard someone yell, '[W]e'll get that son of a bitch for you, and goddamn him, that motherfucker, we'll kill him for you.' Cordray then took his rifle and walked towards the bottom of the driveway. As soon as Cordray reached the bottom of the driveway, a flashlight illuminated his face. Cordray hid behind a rock.

"Cordray testified that he heard a door open and someone yelled, '[T]his is it.' A gun was fired, and Cordray thought that the shot was being directed at Kristen and Mary. Cordray testified that he stood up and fired one shot in the air. He then fired six more shots 'in rapid succession,' claiming that he was aiming at the

ground behind the car. He testified that he never intended to hit the car or anyone in the car. Cordray testified that he slipped on a rock at the time he started shooting.

"The car left after the shots were fired. The Cordrays returned to the house, and Mary called the sheriff. Cordray met with Agent William Halvorsen and provided a history of past experiences with trespassers. He told Agent Halvorsen that he was certain he was shooting behind the car.

"The shooting victims told a different story. Brent Simonis testified that he went to Jeremy Bowman's home early in the evening. After dinner, the boys went out to cruise in town. Simonis and Bowman got into Scott Brown's truck, and they drove to the missile silo. Simonis testified that they got out of the truck and were yelling but he could not remember what was said. As they drove back to town, Simonis testified that a vehicle behind them gave chase. Simonis saw a spotlight coming from one of the car's windows. Simonis acknowledged that he was shining a small flashlight at the driver of the car. The car eventually turned off the road. After reaching the main street, the boys cruised around. Simonis testified that they all felt an '[a]drenaline rush.' They were excited and enjoyed being chased. After 30 minutes, the boys got in Bowman's car and headed back towards the silo.

"As they neared Cordray's home, the boys were honking the horn and yelling. Bowman positioned his car so that they could leave quickly. Suddenly, Simonis heard a gunshot. Simonis ducked down in the back seat and covered his head with a coat. Simonis saw sparks where bullets were entering the car. The boys left, and during the drive back to town, one of Bowman's tires went flat. While they were stopped, Simonis removed the coat from over his head. Simonis and Bowman tried to rouse Brown, but they were unsuccessful. Simonis thought there was 'no way' that Brown was alive.

"Simonis suffered a small abrasion to his abdomen. Bowman had minor scratches to his forehead and some grass and debris in his hair. Brown received three 'major' gunshot wounds: one to the right side of his head at the temple, one to his jaw, and one to his lower neck area. Brown was pronounced dead at the scene." *Cordray*, Slip op. at 2-5.

Cordray raises nine issues on appeal. The first four issues deal with the use, meaning, and clarity of the word "reckless" as used in the instructions.

Cordray first cites *United States v. Gaudin*, 515 U.S. 506, 132 L. Ed. 2d 444, 115 S. Ct. 2310 (1995), for the proposition that a criminal defendant has a due process right to have the jury properly instructed on the elements of a crime. *Gaudin*, however, stands for a much narrower principle. Gaudin was charged with making false statements on Department of Housing and Urban Development (HUD) loan documents. He knowingly inflated the appraised value

of the mortgaged property and misrepresented which party was to pay closing costs. Government witnesses explained why the information Gaudin allegedly falsified was important. The trial judge instructed the jury that one of the elements the government was required to prove in order to convict Gaudin was that the alleged false statements were material to the activities and decisions of HUD. "But, the court further instructed, '[t]he issue of materiality . . . is not submitted to you for your decision but rather is a matter for the decision of the court. You are instructed that the statements charged in the indictment are material statements.'" 515 U.S. at 508. The Supreme Court held that it was unconstitutional for the trial judge to decide the question of materiality as a matter of law because "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged. The trial judge's refusal to allow the jury to pass on the 'materiality' of Gaudin's false statements infringed that right." 515 U.S. at 522-23. There is no question in the present case of the trial court's refusing to let the jury determine an essential element of the charged offense.

Instead, the complaint is that the trial court did not provide the jury with a definition of reckless. No instruction on the definition of reckless was requested. Where the party complaining of the trial court's failure to give an instruction did not object to the lack of the instruction before the jury retired to consider its verdict, the failure to give an instruction will be reviewed only for clear error. K.S.A. 2002 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility that the jury would have rendered a different verdict had the error not occurred. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003).

For the death of Brown, the State charged Cordray with murder in the first degree on alternative theories of premeditated murder and felony murder. The jury was instructed on the lesser offenses of intentional second-degree murder, reckless second-degree murder, voluntary manslaughter, and involuntary manslaughter. The jury was instructed that, in order for the State to establish the

charge of reckless second-degree murder, it had to prove that Cordray killed Brown "unintentionally but recklessly under circumstances showing extreme indifference to the value of human life."

Cordray contends that a definition of reckless was necessary because when reckless rises to the level of criminal culpability it is more than merely being careless, which is listed as a dictionary synonym of reckless. In other words, he contends that reckless, when used as a criminal element, has a meaning other than its ordinary meaning. Cordray contends that because the legal definition of reckless involves more culpability than its ordinary meaning, permitting the jury to consider the elements instruction for unintentional second-degree murder without a definition of reckless effectively lowered the State's burden of proof on that offense.

The State points out that challenges to jury instructions require the reviewing court to consider all the instructions together, read as a whole. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. *State v. Peterson*, 273 Kan. 217, 221, 42 P.3d 137 (2002). In this case, in addition to being instructed on the elements of unintentional second-degree murder, killing Brown recklessly under circumstances showing extreme indifference to the value of human life, the jury was instructed on involuntary manslaughter, killing Brown recklessly. The *Cordray* Court of Appeals stated that if, as in the present case, a jury is instructed on both unintentional second-degree murder and reckless involuntary manslaughter, it "is put on notice that it must determine whether a reckless killing involves an extreme degree of recklessness and is a depraved heart murder or involves a lower degree of recklessness and is involuntary manslaughter." Slip op. at 8.

In *State v. Robinson*, 261 Kan. 865, 875-77, 934 P.2d 38 (1997), this court considered whether the phrase "extreme indifference to the value of human life" was "so vague that a jury needs an instruction to explain it." The court rejected the contention and quoted from the comments to the Model Penal Code depraved heart statute, on which the Kansas reckless second-degree murder statute

(now K.S.A. 2002 Supp. 21-3402[b]) is based, to the effect that being more specific in explaining extreme indifference to the value of human life is undesirable. 261 Kan. at 877.

Cordray asserts that the Court of Appeals missed his point, which is that the jury was not properly instructed on either offense due to the trial court's failure to define reckless. As the Court of Appeals stated, however, different degrees of recklessness are involved in the two offenses. One definition of reckless necessarily would have used the language of the elements instruction for unintentional second-degree murder to distinguish the degrees. Thus, the instructions for the two offenses taken together acceptably conveyed the meanings and degrees of recklessness to the jury. The State's burden of proof for unintentional second-degree murder is clearly stated in the elements instruction as "recklessly under circumstances showing extreme indifference to the value of human life" and would not have been altered by some further definition of reckless.

Cordray contends that the trial court abused its discretion by telling the jury that no further clarification was needed of the elements instruction for reckless second-degree murder.

During deliberations, the jury asked for "an interpretation or clarification" of the phrase "under circumstances showing extreme indifference to the value of human life." The trial court responded: "No further clarification of the phrase is necessary. It is for you, the jury, to determine what this phrase means." Neither the State nor defense counsel objected to the court's response to the jury's inquiry. Then defense counsel renewed his objection to the instruction and the applicability of the statute on vagueness grounds.

Under K.S.A. 22-3420(3), a trial court is required to respond to a jury's request for further information as to any part of the law or evidence. The manner and extent of the trial court's response, however, rests in the sound discretion of the trial court. *State v. Sperry*, 267 Kan. 287, 311, 978 P.2d 933 (1999).

Citing *State v. Mitchell*, 23 Kan. App. 2d 413, 419-20, 932 P.2d 1012 (1997), the *Cordray* Court of Appeals found no abuse of the trial court's discretion in its declining to provide an interpretation or clarification of the phrase. Slip op. at 10. In *Mitchell*, the Court

of Appeals determined that "[t]he phrase 'extreme indifference to the value of human life' is easily understood," and rejected a void-for-vagueness challenge to the second-degree murder statute. 23 Kan. App. 2d 413, Syl. ¶ 6. A few months later in *Robinson,* 261 Kan. 865, this court reached the same conclusion: "A jury is expected to decipher many difficult phrases without receiving specific definitions, such as the term 'reasonable doubt.' The phrase 'extreme indifference to the value of human life' is not so vague as to be unconstitutionally void." 261 Kan. at 877.

Cordray argues that *Robinson* does not control this issue because it involved a constitutional challenge to the statute rather than a complaint about the trial court's failure to provide information in response to the jury's inquiry. The vagueness issue in *Robinson,* however, had several aspects, the last of which was whether an instruction was needed to explain the phrase "extreme indifference to the value of human life." The court rejected the contention that the phrase is so vague that a jury needs an instruction to explain it. 261 Kan. at 877. The court's reasoning, if not the narrow holding, is applicable to the jury request in the present case. In *Robinson,* the court concluded that an explanation was not needed for the complained-of phrase; in the present case, the trial court responded to the jury's' request for an interpretation or clarification of the phrase by telling it that no further clarification of the phrase was necessary. No convincing ground has been presented to this court for distinguishing *Robinson* from the present case. Moreover, defense counsel's acquiescence in the response drafted by the trial judge to the jury's request weighs heavily against this court finding any abuse of discretion in the response. See *State v. Bruce,* 255 Kan. 388, 397-98, 874 P.2d 1165 (1994) (defendant's approving of erroneous language of response to jury request precluded his complaining of it on appeal).

Cordray also contends that K.S.A. 2002 Supp. 21-3402(b) is unconstitutionally vague as applied to the facts of this case.

The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and, before a statute may be stricken down, it must clearly appear the statute violates the constitution. *State v. Engles,* 270 Kan. 530, 531, 17 P.3d 355 (2001).

At trial, Cordray argued that the language of K.S.A. 2002 Supp. 21-3402(b) was unconstitutionally vague. The statute provides that "[m]urder in the second degree is the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." On appeal, Cordray added that the vagueness of the statute was shown by the jury's asking for an interpretation or clarification of the meaning of the phrase "extreme indifference to the value of human life." The Court of Appeals, citing *Robinson*, 261 Kan. at 877, held that the phrase is not so vague as to be unconstitutionally void. *Cordray*, Slip op. at 11.

Cordray would distinguish *Robinson*, as involving the question whether the statutory language was unconstitutionally vague on its face, from the present case where the question is whether the statute was unconstitutionally vague *as applied*. He states that his defense counsel's objections at trial were to the applicability of the statute on vagueness grounds. Examination of the record references shows that only after the matter had been submitted to the jury did defense counsel object "to the applicability of the statute on vagueness grounds . . . ." When Cordray on appeal challenges the statute "as applied," he refers to trial occurrences rather than to the statute as applied to the circumstances surrounding the shooting death of Brown. Cordray complains that the jury indicated it was not able to understand the statutory language and that the jury was not properly instructed on ordinary recklessness or involuntary manslaughter. For penal statutes, the vagueness issue is a due process one concerned with whether, when measured by common understanding and practice, the law gives reasonable notice of what conduct is proscribed or how persons may conform their conduct to the requirements of law. *State v. Adams*, 254 Kan. 436, 438-39, 866 P.2d 1017 (1994). In the circumstances of this case, a question of unconstitutional vagueness asks whether the statute gave Cordray reasonable notice that criminal penalties could be imposed for recklessly killing a person in circumstances manifesting extreme indifference to the value of human life. The question is not whether the jury had questions about the scope and meaning of the statute. We can only conclude that what Cordray really con-

tends is that the statute is unconstitutionally vague on its face and that certain aspects of the jury instructions and questions would support the court's invalidating the statute as unconstitutionally vague. As the Court of Appeals stated, our court answered this question in the negative in *Robinson*.

Cordray next complains that the trial court improperly instructed the jury that involuntary manslaughter was a lesser included offense of voluntary manslaughter rather than a lesser included offense of second-degree murder. Thus, the jury was instructed that "[i]n determining whether Robert K. Cordray is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter." In a separate instruction, the jury was told: "If you cannot agree that Robert K. Cordray is guilty of voluntary manslaughter, you should then consider the lesser included offense of involuntary manslaughter." He contends that, as a result, the jury did not have the benefit of comparing the elements of unintentional second-degree murder with the elements of involuntary manslaughter in order to determine the degree of recklessness. Noting that the jury was instructed on all relevant lesser offenses, the *Cordray* Court of Appeals found no reversible error. Slip op. at 14. The Court of Appeals observed, but did not find it significant, that involuntary manslaughter is not a lesser included offense of voluntary manslaughter. Slip op. at 13.

Cordray repeats his argument that the jury could not understand the meaning of the phrase "extreme indifference to the value of human life." What is different in this issue is his insistence that it was essential for the jury to compare the language of the involuntary manslaughter elements with those of unintentional second-degree murder in order for it to understand the degree of recklessness expressed in the phrase "extreme indifference to the value of human life." Defense counsel did not object to the way the trial court instructed on involuntary manslaughter. Hence, the court applies a clearly erroneous standard in its review of the instructions. *Davis*, 275 Kan. at 115.

Implicit in this court's decision in *Robinson* is the rejection of Cordray's position that the jury could not understand the complained-of phrase without considering the instructions for uninten-

tional second-degree murder and involuntary manslaughter together. In *Robinson,* the court concluded that the phrase "extreme indifference to the value of human life" in the elements instruction of unintentional second-degree murder is not so vague that a jury needs an explanation of it. 261 Kan. at 877. Hence, the court determined that the elements instruction of unintentional second-degree murder can stand on its own. An involuntary manslaughter instruction was given in *Robinson* and was the subject of a separate issue—whether the jury would know that involuntary manslaughter and unintentional second-degree murder were separate offenses—but its presence was not a factor considered by the court in concluding that a jury can understand what extreme indifference to the value of human life is. 261 Kan. at 877.

Cordray also contends that the trial court's instructing on lesser included offenses, over Cordray's objection, deprived him of a fair trial by precluding an all-or-nothing defense.

Cordray objected to the trial court's instructing on any lesser offenses of the first-degree murder charge. Citing K.S.A. 21-3107 and K.S.A. 22-3414, the trial court expressed the opinion that it was obligated to instruct in accord with the evidence rather than with the defendant's desire.

The Court of Appeals stated that even after any mention of jury instructions for lesser included crimes was removed from K.S.A. 21-3107 in 1998, see L. 1998, ch. 185, sec. 1, "a trial judge still has the affirmative duty to instruct the jury on all lesser included offenses when the evidence introduced at the trial is such that the defendant might reasonably have been convicted of a lesser offense. *State v. Bradford,* 27 Kan. App. 2d 597, 599, 3 P.3d 104 (2000)." *Cordray,* Slip op. at 15-16. The Court of Appeals also stated, however, that it is within the discretion of a trial judge not to give lesser included instructions. Slip op. at 16. In his petition for review, Cordray argues that the trial court's disregard of his objection to lesser offense instructions on account of its mistaken belief that it had no discretion constitutes an abuse of discretion.

We agree that the trial court still has a duty to instruct on lesser included offenses. However, K.S.A. 2002 Supp. 22-3414(3), not *Bradford,* is authority for that holding. In *Bradford,* the offense

occurred on July 3, 1998, 2 days after the effective date of the amendment to K.S.A. 21-3107(3). Although the current version of the statute applied, the Court of Appeals did not acknowledge that the statute had been amended, and relied on the language of 21-3107(3) as it read prior to the amendment. We do not agree that instructing the jury on the crimes charged or a lesser included crime is discretionary.

Until July 1, 1998, when the amendment to K.S.A. 21-3107(3) became effective, a trial court had an affirmative duty to instruct on all lesser offenses for which there was evidence. See *State v. Gould*, 271 Kan. 394, 402, 23 P.3d 801 (2001). The current versions of the applicable statutes provide:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both." K.S.A. 2002 Supp. 21-3107(2).

"In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime.

. . . .

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict . . . ." K.S.A. 2002 Supp. 22-3414(3).

The 1998 amendment to 21-3107 has been said to relieve trial courts of the obligation to *sua sponte* instruct on lesser included offenses, see *Gould*, 271 Kan. at 402, but the amendment did not relieve trial courts of the obligation to instruct on lesser offenses. K.S.A. 2002 Supp. 22-3414(3) states that the trial judge shall instruct the jury as to the crime charged and lesser included crimes. What the amendment modified was the standard of review for a failure to so instruct. In the past, a defendant who had not objected to the trial court's failure to instruct on lesser offenses could have a conviction overturned simply because the trial court failed to so instruct. See, *e.g.*, *State v. Weyer*, 210 Kan. 721, 504 P.2d 178 (1972). The amendment did not eliminate that possibility, but now a defendant, silent on the subject in the trial court, may have his or her conviction reversed for lack of a lesser offense instruction only if the failure to instruct was clearly erroneous.

Cordray relies on *State v. Coffman*, 260 Kan. 811, 925 P.2d 419 (1996), in arguing that under the former law a defendant was entitled upon request to present an all-or-nothing defense, *i.e.*, a defendant was entitled to jury instructions on only the charged offense. In *Coffman*, defendant requested the trial judge not to instruct on the lesser included offense. The trial judge granted the request, Coffman was convicted of the charged crime, and Coffman unsuccessfully sought relief from his own decision from the reviewing court. The basis of this court's ruling was not defendant's right to present an all-or-nothing defense, but rather the language of 21-3107(3) prior to amendment: "If the defendant objects to the giving of the instructions, the defendant shall be considered to have waived objection to any error in the failure to give them, and the failure shall not be a basis for reversal of the case on appeal." 260 Kan. at 813. Neither the case law nor statutes relied on by Cordray support a determination that a criminal defendant has a right to an all-or-nothing defense.

Cordray also argues that he was prejudiced by the trial court's overruling his objection to lesser offense instructions in the particular circumstances of this case. He contends that the jury's not convicting him of the charged crime demonstrates the real possibility that he would have been acquitted of criminal causation of Brown's death if the only elements instruction had been for the charged crime. His conjecture as to what the verdict means is nothing more than that. The conviction may as well be seen as demonstrating that the jury believed Cordray bore criminal responsibility for Brown's death and would have convicted him of the greater offense if it had been the only option. Also in the realm of pure speculation is Cordray's contention that the large number of lesser offenses encouraged the jury to convict him of something.

Cordray next argues that there was insufficient evidence to support the jury's finding that he recklessly killed Brown in circumstances showing extreme indifference to the value of human life. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could

have found the defendant guilty beyond a reasonable doubt. *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

On this issue, the *Cordray* Court of Appeals stated:

"It was 'completely dark' when Cordray fired his gun, and he could only identify headlight and taillight patterns. Cordray testified that he intended to fire warning shots. He fired seven shots in rapid succession while aiming at the ground behind the car.

"During his time in the service as a Marine, Cordray qualified as an expert marksman. Cordray was standing on higher ground than the boys in the car, but he did not know the exact location of the boys.

"Cordray could not see anything but a silhouette. He testified that the car started to leave after the third or fourth shot was fired. Cordray maintained at trial that he slipped on a rock at the time he fired the gun, which caused his aim to go awry.

"It seems that Cordray is sincere when he claims that he did not intend to kill Brown or injure any of the car's passengers. However, Cordray fired 7 shots into the dark. Cordray's actions showed extreme recklessness and total disregard for the value of human life. There was sufficient evidence to support the jury's decision." Slip op. at 18.

Cordray simply reiterates his position that the degree of recklessness required for a conviction of unintentional second-degree murder is not present in his actions. He did not dispute the evidence as set out in the Court of Appeals' opinion.

Here, the evidence, viewed in a light most favorable to the State, showed that Cordray fired into darkness in the direction of a vehicle that he knew was occupied. This evidence was sufficient to enable a rational factfinder to find Cordray guilty of unintentional second-degree murder, and evidence that his shots did not go where he intended does nothing to mitigate the extreme recklessness of his conduct.

Cordray also argues that the trial court improperly excluded evidence bearing on the credibility of the victim witnesses.

The State filed a motion in limine seeking an order prohibiting Cordray from introducing any evidence concerning Bowman and Simonis both being charged with criminal trespass arising out of an after-hours incident which occurred in June 2000 at the Council Grove city swimming pool. For the purpose of the motion, Bowman and Simonis testified outside the presence of the jury. Bow-

man and Simonis have been friends since fourth grade. During the summer of 2000, Bowman and Simonis spent quite a bit of time together with friends. One night in June of that summer, Bowman and Simonis and two other friends climbed the fence and swam in their boxer shorts at the city pool after it was closed. When police officers arrived, the boys grabbed their clothes, climbed back over the fence, and ran. Simonis, however, did not make it back over the fence before being stopped by two police officers. When the officers asked Simonis who it was that got away, Simonis said, "I don't know." Simonis lied to the officers because he did not want to get his friends in trouble.

The trial court granted the State's motion, but stated that it would "re-examine the issue if requested, after the witness has testified on direct examination at trial and will consider any memorandum which counsel wish to present." After Simonis testified, defense counsel asked the trial court to reconsider the admissibility of evidence that Simonis and Bowman trespassed at the city swimming pool. Defense counsel argued that the evidence was relevant to show bias because it would show that Simonis lied to police to help Bowman. The trial court declined to change its ruling.

Cordray argued that under K.S.A. 60-420 he should have been allowed to cross-examine Simonis on his lying to police officers in order to protect his friend Bowman. The statute provides:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

K.S.A. 60-421 limits evidence of criminal convictions. K.S.A. 60-422(d) provides: "As affecting the credibility of a witness . . . (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible." Cordray contends that K.S.A. 60-422(d) was not applicable to evidence that Simonis lied to police officers to protect Bowman and, furthermore, that bias of a witness may always be shown.

The Court of Appeals' ruling on this issue seems to have been that exclusion of the evidence was not error because all of what

Cordray sought to introduce to undermine Simonis' credibility had been placed into evidence by other means. The Court of Appeals stated:

"Simonis testified that he was never convicted of criminal trespass. Cordray was able to present evidence to discredit Bowman and Simonis. Simonis testified that he went to the Cordray property two times prior to February 2000. Simonis also spoke of his prior convictions for criminal damage to property. Bowman testified about prior visits to the silo and testified about his long-standing relationship with Simonis." *Cordray*, Slip op. at 20.

Although Cordray concedes in his petition for review that other evidence of the relationship and credibility of Bowman and Simonis was admitted, he contends that what was excluded was more probative.

The admission or exclusion of evidence lies within the sound discretion of the trial court. This court's standard of review of the trial court's exclusion of evidence that Simonis lied to police officers to protect Bowman is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Cordray, who asserts that the trial court abused its discretion, bears the burden of showing such an abuse of discretion. See *State v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 (2002).

With other evidence casting doubt on the credibility of Simonis being presented to the jury, Cordray has a significant burden of showing that the trial court abused its discretion by excluding corroborating evidence. Cordray asserts that the excluded evidence was more probative, but he has not shown why it is not more likely that evidence involving visits to the vicinity of Cordray's property would bear more directly on Simonis' credibility in this case than would evidence of an incident at the city swimming pool. Cordray has not shown that the trial court abused its discretion in this regard. In addition, the evidence sufficient to support Cordray's conviction was set out earlier in this opinion. That evidence was not based on Simonis' testimony, but rather on Cordray's testimony, and attacking Simonis' credibility does not diminish that evidence.

Cordray next argues that the trial court abused its discretion in admitting a photograph taken of the murder victim while he was alive.

The trial court has broad discretion regarding the admission of demonstrative photographs. *State v. Kirby*, 272 Kan. 1170, 1186, 39 P.3d 1 (2002). In this case, the trial court admitted a photograph of Brown that was offered by the State to identify the victim and show the extent and nature of the wounds he suffered. The Court of Appeals determined that the photograph was relevant. *Cordray*, Slip op. at 22. The Court of Appeals further stated that Cordray's failure to include the photograph in the record on appeal prevented it from fully assessing the prejudicial nature of the photograph. Slip op. at 22.

In his petition for review, Cordray disputes the photograph's relevance. He states that the extent of Brown's wounds was apparent from autopsy photographs that were in evidence and, furthermore, the extent of the wounds was not at issue because the cause of death was stipulated. Cordray, however, provides no record references for the autopsy photographs or stipulation. With regard to his failing to include the complained-of photograph in the record on appeal, Cordray contends that it was unnecessary because the introduction of a photograph of a murder victim taken while alive is inherently prejudicial.

This issue is governed by this court's opinion in *State v. Hebert*, 277 Kan. 61, 82 P.3d 470 (2004), where we have determined that there was no abuse of discretion in the admission of a predeath photograph of the murder victim. There was some relevance to the photograph. Hebert was convicted of murdering a law enforcement officer, and the victim's identity as a law enforcement officer was shown in the photograph of him wearing his uniform. Whether the victim was a law enforcement officer, however, was not a contested issue. In the present case, the photograph's relevance also may not have been to contested issues, but it served to identify the victim and show the extent of his wounds. The trial court did not abuse its discretion in admitting the predeath photograph of Brown.

Cordray finally argues that he was denied a fair trial by cumulative errors. The Court of Appeals found only one error, instruc-

tion of the jury on the nonexistent crime of attempted unintentional second-degree murder. The attempted unintentional second-degree murder instruction is not a subject of the petition for review. We find no errors among the issues before this court. Hence, there are no cumulative errors.

Judgment of the Court of Appeals is affirmed. Judgment of the district court is affirmed in part and reversed in part.

BEIER, J., not participating.

BRAZIL, S.J., assigned.