NOT DESIGNATED FOR PUBLICATION

No. 116,561

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TRAVIS GLENN CONDER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Opinion filed May 11, 2018. Affirmed.

*James Crux*, legal intern, and *Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jodi Lifin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., GARDNER, J., and BURGESS, S.J.

PER CURIAM: On Travis Glenn Conder's wedding night, he shot his brother-in-law and his mother-in-law. The jury acquitted him of all charges related to the shooting of his brother-in-law, but convicted him of reckless aggravated battery of his mother-in-law. Conder's appeal raises several claims of pretrial, trial, and posttrial error. Finding no reversible error, we affirm.

1

*Factual and procedural background*

Travis Conder and Shanda Britton were married on July 18, 2015, in Wamego, Kansas. They celebrated with their friends and family at the reception until about midnight. Attendees drank alcohol socially at the reception, as did Conder, Shanda, Tyrel Britton (Conder's brother-in-law), and Rose Britton (Conder's mother-in-law).

The family headed back to the home of Shanda's parents, where Conder, Shanda, and Tyrel also lived. After they returned to the Britton home, Shanda took Tyrel for a drive in her truck. This irritated Conder, as he thought it was a waste of gas. When Shanda and Tyrel returned, Conder and Shanda got into an argument.

During the argument, Tyrel walked toward Conder and Shanda, put his arm around Conder and said something to the effect of "hey, bro knock it off. This is . . . my sister; this is your wife; it's your wedding night." Conder and Tyrel started cussing at each other and calling each other names. Conder was about 5'11" tall and weighed 125 pounds, while Tyrel was 6'7" tall and weighed about 300 pounds.

The name-calling may have escalated into a physical altercation between Tyrel and Conder—testimony conflicts on that point. At trial, Tyrel said he did not punch or attempt to punch Conder. However, in the ambulance on the way to the hospital, he told a law enforcement officer that he threw a punch at Conder but did not think it landed. Tyrel told another law enforcement officer that he tried to punch Conder after Conder bumped chests with him, although Tyrel was not sure whether he actually hit him. Shanda testified that Tyrel "[p]opped [Conder] in the jaw." Conder said that Tyrel hit him in the face.

Rose got between the two men and told Tyrel to walk away to calm down. Tyrel walked towards the elementary school across the street and smoked a cigarette. Conder

2

went back into the house and woke up his friend Robert Ford, who was sleeping on the couch, and told him that Tyrel had punched him. Conder got his loaded 9mm handgun, stuck it in his waistband, and returned to the porch.

Tyrel stayed across the street for 20 to 30 minutes, then walked back toward the house. Testimony conflicts about whether Tyrel threatened Conder at this point. Tyrel and Rose both testified that Tyrel asked Rose—or was about to ask her—if he could go to bed. In contrast, Ford testified that Tyrel loudly threatened Conder when Tyrel came back across the street. Conder and Shanda also testified that Tyrel was angry and threatened to kill Conder. As Tyrel approached the house, Conder stepped toward Tyrel and drew his gun. Tyrel continued approaching Conder and said, "[O]h, you have a gun; you're gonna pull a gun on me. You better use it. You better f---ing shoot me, pussy." Rose stepped toward the men, who were approximately 12 feet apart, and Tyrel pushed her out of the way.

Conder then shot Tyrel multiple times, unloading his clip. Tyrel was shot in his forearm, right thigh, left hip, left knee, and left calf. Conder then went back inside the house, ejected the magazine, and reloaded the gun with another full clip. He claimed that this conformed to the self-defense training he had received. Conder went back outside, apologized, and walked to his uncle's house down the street. Conder told his father, who was there, that he had messed up, then gave him the gun.

Rose was also hit by a bullet during the incident. Conder and Shanda testified that Rose moved into the line of fire, but Rose testified that she did not jump in front of Tyrel when she was shot, and that she would never jump in front of a bullet because she is scared of guns. Tyrel and Rose recovered from their gunshot wounds.

Conder thought he fired 10 rounds at Tyrel. He said that he aimed at Tyrel's legs to stop him and had no intention of killing him. Evidence from the scene included eight

spent shell casings and an unfired round. The 9mm handgun was recovered with a bullet in the chamber and a full magazine. Additionally, a high capacity magazine that held 15 bullets was found beneath a couch cushion inside the Britton home, with 2 bullets remaining inside the magazine. Conder said he believed that he shot Tyrel legally.

Conder was arrested and cooperated with law enforcement. He was charged with one count of attempted second-degree murder for shooting Tyrel, and one count of reckless aggravated battery for shooting Rose.

Before trial, Conder filed a motion for immunity from prosecution. At the combined preliminary and immunity hearing, Tyrel, Rose, Shanda, Ford, and four law enforcement officers testified for the State. Wendi Reeves, a family friend, testified for the defense. The district court denied Conder's motion for self-defense immunity, finding the State had met its burden to establish probable cause that the defendant acted without reasonable justification in the use of force.

Before trial, the State filed a motion in limine to exclude evidence of a 2013 altercation between Conder and Tyrel. The court granted that motion and then reconfirmed it during trial. At trial, Conder's attorney requested a self-defense instruction. The district court denied that request based on its determination that Conder had been the initial aggressor in the shooting. The jury acquitted Conder of all charges related to his shooting of Tyrel but convicted Conder of reckless aggravated battery of Rose.

After trial, the State asked the district court to find that the crime had been committed with a firearm—a deadly weapon—and impose offender registration requirements. Conder objected, contending that the jury, rather than the judge, must determine whether he had used a deadly weapon. The district court found that Conder used a deadly weapon and imposed violent offender registration requirements. The

4

district court sentenced Conder to 8 months in prison with 12 months' postrelease supervision. Conder timely appealed.

*Did the district court properly deny Conder's request for a jury instruction on self-defense?*

We first address Conder's assertion that the district court erred by denying his request for a jury instruction on self-defense.

*Standard of review*

When analyzing jury instruction issues, we follow a three-step process: (1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred below; and (3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). "If the district court erred, and the error did not violate a constitutional right, 'the error is reversible only if [the court] determine[s] that there is a "reasonable probability that the error will or did affect the outcome of the trial in light of the entire record."' *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012) (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011])." *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016).

*Analysis*

Conder admits this issue is somewhat complicated because the jury acquitted him of any offense against Tyrel. But Conder asserts that he was entitled to a self-defense instruction in relation to the charge of aggravated battery against Rose because he was justified in acting in self-defense against Tyrel and his lack of intent follows the bullet.

5

We first consider whether Conder has preserved this issue. Conder's attorney requested a self-defense instruction in his proposed jury instructions and during the jury instructions conference, so he properly preserved this issue for appeal.

We next consider whether error occurred below. To do so, we determine whether the instruction was legally and factually appropriate, employing an unlimited review of the entire record. *McLinn*, 307 Kan. at 318.

*Factually appropriate*

A defendant is "entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory." *State v. McCullough*, 293 Kan. 970, 974, 270 P.3d 1142 (2012). The use of deadly force may be justified when there is a reasonable belief that the use of force is necessary to prevent imminent death or great bodily harm. K.S.A. 2017 Supp. 21-5222(b). However, the justified use of force is limited by K.S.A. 2017 Supp. 21-5226, which provides, in part, that the justification is not available to an initial aggressor or a defendant who:

> "(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or
> "(c) otherwise initially provokes the use of any force against such person or another, unless:
> (1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force." K.S.A. 2017 Supp. 21-5226.

Kansas courts have generally held that when an individual leaves a confrontation, then returns with a loaded firearm and shoots the other person, that individual is not entitled to

a self-defense instruction because that person is acting as an initial aggressor. *State v. Salary*, 301 Kan. 586, 597, 343 P.3d 1165 (2015); *State v. Harmon*, 254 Kan. 87, 91, 865 P.2d 1011 (1993).

Consistent with that general rule, the district court found that Conder was an initial aggressor not entitled to a self-defense instruction. The district court looked at the evidence in the light most favorable to the defendant and found that if any physical contact occurred between Tyrel and Conder during the initial incident, it was an unprovoked punch from Tyrel. But no physical damage from the punch was visible at the hospital soon thereafter. After the initial argument, Rose sent Tyrel across the street to calm down and he was gone for 20 to 30 minutes. The court found that at this point, the initial confrontation was over. Conder went inside, spoke to his friend, got his gun, waited a few minutes, and then went back outside. When Tyrel returned, Conder shot him.

In determining that Conder was the initial aggressor, the district court relied on *Salary*, 301 Kan. at 586. In *Salary*, the defendant shot and killed his uncle after they got into an argument. The defendant argued that he acted in self-defense because he believed his uncle was armed, was known to be aggressive, and had weapons in the home. The Kansas Supreme Court found that the defendant became the initial aggressor because he did not leave his uncle's home when asked, remained in the house, armed himself, and went to meet his uncle, effectively reinserting himself into the situation. That provocation prohibited the defendant from receiving a self-defense instruction. 301 Kan. at 596-98 (citing many Kansas cases holding no self-defense instruction is warranted where the defendant could have avoided the fatal confrontation by staying away).

This case is similar to *Salary*, despite Conder's contentions otherwise. Conder went inside following the initial argument with Tyrel on the porch. Conder spoke briefly with Ford, went into his room and armed himself with a loaded gun, sat for a few

7

minutes, and then went back outside. No immediate threat existed when Conder went inside and armed himself, as Tyrel had walked across the street, was cooling off, and was unarmed. At that point, the conflict had ended and Conder lacked reasonable grounds to believe 20 minutes or more later that he was in imminent danger of death or great bodily harm. The district court properly found that the shooting was not part of the initial altercation; instead, Conder acted as the initial aggressor in starting a new confrontation over 20 minutes later.

Conder contends that this case is different from *Salary* in two respects. First, he claims that he went back outside solely to speak with Shanda. But Conder testified that after he grabbed his loaded gun, he went outside to speak with Shanda *as well as* to ensure that Tyrel "was actually cooling off, as he was supposed to do." And Conder would have had no need for a loaded firearm if his intent were merely to speak with Shanda. The facts thus indicate that he went outside at least in part to engage with Tyrel. Second, Conder points out that he lived at the house so he had no duty to retreat, unlike the defendant in *Salary* who was asked to leave his uncle's home. But Tyrel also lived at that same house, and we cannot rationally compare him to an intruder as Conder invites us to do. Conder did not exhaust every reasonable means to escape whatever danger Tyrel may have posed to him—he could have remained in the house rather than reengaging Tyrel with a loaded firearm.

For the above reasons, an instruction on self-defense was not factually appropriate. Thus, we do not reach the intriguing question whether the self-defense instruction was legally appropriate. Compare *State v. Bradford*, 27 Kan. App. 2d 597, 602, 3 P.3d 104 (2000) (finding that a charge of reckless conduct is based upon an unintentional act and is inconsistent with a self-defense theory because the person acting in self-defense intends to inflict injury on the attacker), *superseded on other grounds by statute as stated in State v. Cordray*, 277 Kan. 43, 82 P.3d 503 (2004), with *Holloman v. State*, 51 P.3d 214, 221-22 (Wyo. 2002) (finding failure to give self-defense instruction reversible error because

8

one's intent, under the doctrine of transferred intent, carries the lack of criminal intent to the unintended consequences and thus precludes criminal responsibility). The district court did not err by denying Conder's request for a jury instruction on self-defense.

*Did the district court err by denying Conder immunity from prosecution?*

We next consider Conder's related claim that the district court erred by denying his motion to find him immune from prosecution. When reviewing this issue, we apply a bifurcated standard of review:  we review the district court's factual findings for substantial competent evidence and review the ultimate legal conclusions de novo. *State v. Hardy*, 305 Kan. 1001, 1012, 390 P.3d 30 (2017).

*Analysis*

A Kansas statute grants immunity from prosecution to individuals who use deadly force in self-defense. K.S.A. 2017 Supp. 21-5231(a). But consistent with the self-defense law addressed above, no immunity is available to a person who initially provokes the use of force.

At an immunity hearing, the State has the burden to establish probable cause that the person asserting immunity was not justified in using force. *State v. Ultreras*, 296 Kan. 828, 845, 295 P.3d 1020 (2013). The district court's determination of probable cause must be based upon stipulated facts or upon evidence received at an evidentiary hearing. *Hardy*, 305 Kan. at 1011-12. The district court must consider the totality of the circumstances, weigh the evidence without deference to the State, and determine whether the State established probable cause that the defendant's use of force was not statutorily justified. 305 Kan. at 1011.

At Conder's evidentiary immunity hearing, the district court stated that it would look at the evidence in the light most favorable to the State. We presume that it actually did so. This was error, as the State acknowledges, because the district court should have viewed the evidence without deference to the State. Thus our task is to determine whether that error was harmless.

*Harmless error analysis*

We apply the statutory harmless error standard to this issue. *Ultreras*, 296 Kan. at 845. Under that standard, an error is harmless unless "there is a reasonable probability the error affected the outcome of the trial in light of the entire record." *State v. Crawford*, 300 Kan. 740, 746, 334 P.3d 311 (2014). The party benefiting from the error—in this case, the State—bears the burden of proving the error was harmless. See *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016).

The State has met that burden. Probable cause at a preliminary examination requires evidence causing a person of ordinary prudence and caution to entertain a reasonable belief of the defendant's guilt. *State v. Berg*, 270 Kan. 237, 238, 13 P.3d 914 (2000). A sufficient claim of self-defense requires "evidence supporting both (1) a subjective belief on the part of the defendant that (a) the use of unlawful force is imminent and (b) the use of force is necessary and (2) an objective determination that a reasonable person would have come to the same conclusions." *State v. Andrew*, 301 Kan. 36, 45, 340 P.3d 476 (2014). Conder testified to his subjective belief that deadly force was necessary to prevent imminent use of unlawful force against him. The State, therefore, needed to establish probable cause that a reasonable person would not have believed that deadly force was necessary in self-defense.

Conder focuses on selected evidence from the immunity hearing: Tyrel's admission that he was upset that evening; Rose's statement that Tyrel's friend put Tyrel in

10

a headlock to prevent him from attacking his father in the car on the way home from the wedding; Shanda's testimony that Tyrel had hit Conder before Tyrel went to cool off; Shanda's testimony that Tyrel threatened to kill Conder as Tyrel returned to the house; and Wendi Reeves' testimony that Rose repeatedly said on the night of the shooting that Conder had acted in self-defense.

Conder also notes the testimony by four law enforcement officers. One interviewed witnesses at the hospital. Tyrel told the officer that Conder chest-bumped him before he threw a punch, but Tyrel was unsure if he actually hit Conder. Shanda told an officer that Conder acted in self-defense because Tyrel was much bigger than Conder, and he could "get rather upset sometimes." Conder told a law enforcement officer that he took out his gun when Tyrel began to walk toward him, and that he did not say anything to provoke him. Conder told the officer that he did not want to kill Tyrel, but that because of Tyrel's size, he feared for his safety. Conder also told the officer that he went back into the house and reloaded his gun, walked outside and apologized, then walked to his uncle's house. Conder acknowledged that if he had stayed inside the house, the incident likely would not have happened.

We assume, for purposes of this determination, that Tyrel hit Conder before going across the street to cool off. Although testimony established a significant size difference between Tyrel and Conder, the men had known each other and had lived together off and on for 10 years. It is undisputed that Conder went back inside to get his gun when Tyrel went across the street, and that Tyrel stayed across the street for 20 to 30 minutes before he returned to the house where he lived. It is disputed whether Tyrel then threatened to kill Conder. But if we assume that he did threaten Conder, we must put that threat into its context. The two men fought constantly—Tyrel's saying he would kill Conder was a "common statement," a "normal threat," unconcerning to Shanda—Conder's wife and Tyrel's sister. Conder went out to meet Tyrel, who was unarmed. Conder fired eight shots, hitting both Tyrel and Rose, when Tyrel was still about 12 feet away from Conder.

11

The shooting was described as "rapid-fire" and "overkill." Conder then went inside and exchanged his empty clip for a fully loaded one.

We are convinced that had the district considered all the evidence presented at the immunity hearing without giving deference to the State, it would nonetheless have found the State met its burden to show probable cause that a reasonable person would not have believed that Conder's use of deadly force was necessary in self-defense. Thus Conder was not entitled to immunity. We are also persuaded that the district court's error in applying an incorrect legal standard at the immunity hearing was harmless because there is no reasonable probability that the error affected the outcome of Conder's trial. See *Ultreras*, 296 Kan. at 845.

*Did the district court properly exclude evidence of prior violent acts by the victim?*

Following the preliminary hearing, the State filed a motion in limine asking the district court to exclude evidence of a 2013 incident in which Tyrel had allegedly strangled Conder. Conder proffered that siblings Shanda and Tyrel got into an argument and Tyrel began strangling Shanda. Conder then jumped on Tyrel's back and put him in a chokehold which caused Tyrel to release Shanda. Conder then went outside but Tyrel followed him a few minutes later and strangled him until he nearly blacked out. Tyrel stopped only when Shanda hit him in the back with a rake. Conder suffered a bruised esophagus from the ordeal. Tyrel was charged with battery against Conder but that charge was dismissed.

Defense counsel argued this event was relevant because it impacted Conder's state of mind at the time of the shooting in July 2015. The district court disagreed. It found the evidence irrelevant and granted the State's motion in limine prohibiting the introduction of testimony about the July 2013 incident. At trial, defense counsel again offered the evidence and the district court again excluded it, holding it was too remote in time and

12

was irrelevant. The district court recognized that this kind of evidence could be relevant, but was not relevant here, stating:

> "[The incident] occurred on July 14 of 2013. It didn't involve[] a firearm. And since that time [Tyrel and Conder] continued to live together, as I just heard the defendant testify, a fairly good relationship in the same household. He's a groomsman in the defendant's wedding."

Conder asserts that the district court erred by doing so.

*Standard of review*

This court's first analysis is whether the evidence is relevant. Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b); see *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). This definition encompasses two elements: a materiality element and a probative element. Standards of review vary for each element.

Evidence is material when the fact it supports is in dispute or in issue in the case. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). The appellate standard of review for materiality is de novo. *Page*, 303 Kan. at 550-51. Evidence is probative if it has any tendency to prove any material fact. *State v. Dupree*, 304 Kan. 43, 63, 371 P.3d 862 (2016). We review the district court's assessment of the probative value of evidence under an abuse of discretion standard. *Page*, 303 Kan. at 550. Judicial discretion is abused if the judicial decision (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

13

*Analysis*

Relevancy requires some logical connection between the asserted facts and the inference or result they are intended to establish. See *State v. Reid*, 286 Kan. 494, 502-03, 186 P.3d 713 (2008). The district court found no logical connection between the 2013 incident and the 2015 shooting, so found the 2013 incident was not relevant and was too remote in time. The determination of remoteness and relevance is within the discretion of the district court and we will overturn it only if the decision was arbitrary, fanciful, or unreasonable, based on an error of law, or based on an error of fact. See *State v. Houston*, 289 Kan. 252, 262, 213 P.3d 728 (2009). The parties agree this abuse of discretion standard applies.

Conder claims the district court erred in applying *Houston*. The court in *Houston* determined that the district court properly excluded evidence of prior violent acts by the victim, stating: "Because this incident occurred 2 years before the shooting, per *Walters* it was well within the trial court's discretion to determine that the evidence failed to provide a logical connection to Houston's state of mind the day of the shooting." 289 Kan. at 262. The *Houston* court recognized that its decision did not prevent the defendant from presenting his theory of defense. 298 Kan. at 262-63.

Conder claims that evidence of Tyrel's 2013 violence was not merely cumulative so his case is more like *State v. Mays*, 254 Kan. 479, 866 P.2d 1037 (1994). There, the Kansas Supreme Court found an abuse of discretion where the district court excluded relevant, noncumulative evidence which had the effect of precluding the defendant from presenting any evidence supporting his theory of defense. 254 Kan. at 287-88.

Such is not the case here. Conder fully, and apparently persuasively, presented his self-defense theory to the jury even without evidence of the 2013 altercation. Conder testified that he acted in self-defense and that the shooting was justified. He testified

14

generally that he and Tyrel had had altercations in the past, as well as to the size differences between them. Shanda also testified that Conder and Tyrel constantly bickered and fought. And other evidence showed that Rose repeatedly stated her belief that Conder had acted in self-defense.

Underlying the district court's decision was its finding that Conder was the initial aggressor. Had there been no 20-minute break in the altercation, the court's decision not to admit evidence of the 2013 incident may have been different. But given the totality of the facts, we find no abuse of discretion in that decision. We also agree that if the court erred in admitting this evidence, the error was harmless because the excluded evidence was not necessary to show Conder's state of mind.

*Was it clearly erroneous for the district court not to include a lesser included offense instruction for battery?*

We next address Conder's claim that the district court erred by not including a lesser included offense instruction for battery. When the giving of or failure to give a lesser included offense instruction is challenged on appeal, we first determine whether we have jurisdiction to consider the issue or the party failed to preserve the issue below. Next, we determine the merits of the claim as to whether there was an error during the trial. Finally, we determine whether the error was harmless or requires reversal. *McLinn*, 307 Kan. at 317.

Conder did not request an instruction for simple battery as a lesser included offense of the aggravated battery charge. We may nonetheless reach this issue for the first time on appeal, see K.S.A. 2017 Supp. 22-3414, but our review is limited to determining whether the district court's decision was clearly erroneous. See *Louis*, 305 Kan. at 457. In evaluating whether the failure to give an instruction amounts to clear error, we exercise unlimited review of the record as a whole. *State v. Betancourt*, 299 Kan. 131, 135, 322

15

P.3d 353 (2014). The defendant bears the burden to establish clear error. 299 Kan. at 135. The defendant must "'firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 770, 366 P.3d 232 (2016).

*Analysis*

We consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. A legally appropriate instruction must always fairly and accurately state the applicable law. *Plummer*, 295 Kan. at 161. An instruction regarding a lesser included offense is legally appropriate when the lesser crime is an included offense of the charged crime. 295 Kan. at 161. Such is the case here —simple battery is a lesser included offense of aggravated battery. K.S.A. 2017 Supp. 21-5413; *State v. Simmons*, 295 Kan. 171, 175, 283 P.3d 212 (2012). Thus, an instruction regarding misdemeanor battery would have been legally appropriate.

We next determine whether an instruction on simple battery would have been factually appropriate. The district court has a duty to provide the jury with a lesser included offense instruction when there is some evidence to reasonably justify a conviction of some lesser included offense. K.S.A 2017 Supp. 22-3414(c); State v. *Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014). The evidence supporting the lesser included offense "need not be strong or conclusive to warrant the instruction." *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014). As the Kansas Supreme Court has recently reminded us:

> "We have advised district courts to approach the determination of whether a lesser
> included offense is factually supported as if the court was conducting a sufficiency
> review using the following test: Is there some evidence when viewed in the light most
> favorable to the defendant that would allow a rational factfinder to find the defendant

16

guilty of the lesser included offense? *Plummer*, 295 Kan. at 161-62; *Seba*, 305 Kan. at 204 (asking whether 'there is some evidence, [viewed in a light most favorable to the defendant,] emanating from whatever source and proffered by whichever party, that would reasonably justify a conviction of some lesser included crime'). If so, the lesser included offense instruction should be given." *McLinn*, 307 Kan. at 324-25.

If, however, the evidence at trial excludes a theory of guilt of a lesser offense, failure to instruct the jury on some lesser degree of the crime charged is not grounds for reversal. *State v. Sutherland*, 248 Kan. 96, 101-02, 804 P.2d 970 (1991).

Aggravated battery is defined as recklessly causing great bodily harm or disfigurement to another person. K.S.A. 2017 Supp. 21-5413(b)(2)(A). Simple misdemeanor battery is knowingly or recklessly causing bodily harm to another person or knowingly causing physical contact with another person when done in a rude, insulting, or angry manner. K.S.A. 2017 Supp. 21-5413(a)(1)-(2). Establishing the difference between harm and great bodily harm is usually a decision for the jury. *Simmons*, 295 Kan. at 177; *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241 (2006); see *State v. Brice*, 276 Kan. 758, 773-74, 80 P.3d 1113 (2003) (disapproving of its prior statement that a through and through bullet wound constitutes great bodily harm as a matter of law). "[A] trial court could determine that a bullet wound, even one that missed bone, major arteries, veins, and nerves, is not slight, trivial, moderate, or minor and will not support a lesser included instruction for battery." 276 Kan. at 774. We assume, without deciding, that a simple battery instruction was factually appropriate.

But even if a reasonable jury could have gone either way on the great bodily harm issue, and the district court erred in not giving a lesser included offense instruction, the failure to give the unrequested instruction is not necessarily clearly erroneous. *Williams*, 295 Kan. at 523-24. During this reversibility portion of the analysis, the burden to show clear error remains on the defendant. See 295 Kan. 506, Syl. ¶ 5. Conder bears the burden of firmly convincing us that the jury would have convicted him of simple battery rather

than aggravated battery had the error not occurred. See *McLinn*, 307 Kan. at 326; *State v. Haberlein*, 296 Kan. 195, 204, 290 P.3d 640 (2012).

Conder fails to meet that burden. Conder used a firearm. Although he intended to shoot Tyrel, he also shot Rose, causing her to suffer a gunshot wound which entered and exited her calf. This could easily be more than just a simple battery. Thus the evidence is such that we simply cannot be firmly convinced of which crime the jury might have chosen. "That degree of certainty, or perhaps more accurately, that degree of uncertainty falls short of what is required to meet the clearly erroneous standard." *Williams*, 295 Kan. at 523-24 (finding no clear error in not instructing on lesser included offense). Because we are not firmly convinced there was a real possibility the jury would have convicted Conder of simple battery, had it been given that option, the district judge's failure to instruct *sua sponte* on simple battery was not clearly erroneous.

*Did the district court properly impose violent offender registration requirements?*

Conder next raises an *Apprendi* claim, arguing that he should not be subject to violent offender registration because the judge, rather than the jury, found he used a deadly weapon in convicting him of aggravated assault. "Whether a defendant's constitutional rights as described under *Apprendi* were violated by a district court at sentencing raises a question of law subject to unlimited review." *State v. Dickey*, 301 Kan. 1018, 1036, 350 P.3d 1054 (2015); see *State v. Charles*, 304 Kan. 158, 176 372 P.3d 1109 (2016).

Other than a prior conviction, any fact necessary to increase the punishment for an offense beyond its statutory maximum must be submitted to a jury or established by a guilty plea. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Conder argues that the registration requirement violates this rule because the jury did not find that he used a deadly weapon—the judge did.

18

Registration under the Kansas Offender Registration Act (KORA) is not considered to be a criminal punishment. For a legislature's intended civil remedy to be considered a criminal penalty subject to *Apprendi*'s rule, the appellant must show by the clearest proof that the scheme is "'so punitive either in purpose or effect as to negate'" its nonpunitive or civil intentions. *State v. Meredith*, 306 Kan. 906, 911, 399 P.3d 859 (2017) (quoting *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 [2003]). Conder cannot do so here.

The Kansas Supreme Court has recognized that the Legislature did not intend for registration under KORA to be punitive. *Meredith*, 306 Kan. at 912; *State v. Huey*, 306 Kan. 1005, 1009, 399 P.3d 211 (2017), *petition for cert. docketed* (January 8, 2018). Instead, the court has held that the Legislature enacted KORA's predecessor, the Kansas Sex Offender Registration Act, for the nonpunitive purpose of public safety, and thus was not considered a criminal punishment. *State v. Myers*, 260 Kan. 669, 681, 696, 923 P.2d 1024 (1996). After KORA was enacted, our courts have continued to find that KORA registration is not punitive.

> "Likewise here, no subsequent legislative history leads us to deviate from these holdings, which remain compelling for the classes of non-sex offenders identified in the current iteration of KORA—drug and violent offenders. Accordingly, we hold that the legislature intended KORA registration for all classes of offenders to be civil and nonpunitive." *Meredith*, 306 Kan. at 912.

Conder argues that the scheme is punitive, citing *Charles*. But the Kansas Supreme Court recently held in *Huey* that *Charles* is no longer good law, stating: "[W]e now hold *Charles* is not viable authority for Huey or other violent offenders as to whether KORA is punitive." 306 Kan. at 1006. Because the Kansas Supreme Court holds that KORA registration is not punitive and therefore does not violate *Apprendi*, we affirm Conder's registration requirement.

19

Affirmed.