No. 89,481

STATE OF KANSAS, *Appellee*, v. TYLER BLOCK PATTON, *Appellant*.
(120 P.3d 760)

148

150

Opinion filed September 30, 2005.

*Bob L. Thomas*, of Thomas & Associates, LLC, of Olathe, argued the cause and was on the brief for appellant.

*Richard G. Guinn*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Defendant Tyler Block Patton appeals her jury trial conviction of first-degree murder in violation of K.S.A. 21-3401(a) and her sentence of life imprisonment with the possibility of parole after 25 years directly to this court pursuant to K.S.A. 22-3601(b)(1). She raises nine issues on appeal. Our review of each issue establishes that no reversible error occurred during trial or sentencing. We therefore affirm her conviction and sentence.

On January 16, 2001, at 9:31 p.m., the Overland Park Police Department responded to a 911 call made by the defendant. She was inside her vehicle across the street from the residence she had shared with her husband, Ed Patton, Jr. She told officers that her husband had been sick with the flu and had wanted her to stay elsewhere. She stopped by the residence and entered through the garage, noticing debris and drawers thrown around and items scattered in the stairway. As she started up the stairs she heard a noise which scared her so she ran outside and called the police.

The responding officers entered the residence through the un-locked front door and noticed debris scattered throughout the house. Ed Patton's body was discovered in an upstairs bedroom which was filled with the odor of a decaying body. He was lying on his back in bed with a blanket up to his neck, and his arms were down to his sides. A second blood-soaked blanket was placed over his head, the headboard was splattered with blood, and a piece of his skull was lying up against the blanket. The victim's face was so bloody and swollen that it was unidentifiable.

Dr. Michel Handler conducted the autopsy and testified that the victim had been struck at least eight times in the face and skull and did not have any defensive injuries on his hands and arms to indicate that he was awake during the attack. Four small pieces of dark wood were found in his hair and face, which were later identified as part of a bloody 2-by-4 piece of wood found on the back porch of the residence. He ruled the cause of death a homicide and opined that the victim had been dead for at least 48 hours prior to discovery. Pathologist Dr. Thomas Bennett reviewed the autopsy report, photographs, interviews, and investigative reports

and opined that the victim died either the late evening of January 14 or the early morning hours of January 15, 2001.

Marijuana and drug paraphernalia were found in the basement of the home. Evidence technician Andy Black opined that the extent of drugs discovered was consistent with personal use rather than someone involved in the sale of drugs. Officers discovered a pill bottle in back of the residence near a gate containing six different types of medication and three empty pill bottles inside the residence in the trash.

The defendant was interviewed by Detective Bobby Jo Hohnholt on January 17, 2001. The detective testified over objection that the defendant had recent cuts on her hands during this interview. Initially, the defendant told the detective that she cut herself while sanding cabinets but later said the cuts were from razor blades during a failed suicide attempt. At trial, the defendant said the cuts were from razors and screwdrivers she used while remodeling cabinets.

During this interview, the defendant characterized her relationship in a positive manner, indicating that the victim was the best man ever, that he had her on a pedestal, that she received anything she wanted, and that their marriage only got better over time. However, a January 2, 2001, tape-recorded argument between the defendant and the victim was discovered in the residence that indicated otherwise.

During the recorded argument, the victim indicated he thought the defendant wanted to commit suicide, and the defendant then said that she did not love him and wanted to end the relationship, that she was unhappy with their current residence and the amount of money the victim made, and that she planned to immediately move to a second home they had recently purchased. At trial, the defendant claimed for the first time that this fight was precipitated by her observing the victim using cocaine and that the tape recording was turned on well into the fight. The defendant moved to the new house on January 3, 2001, taking most of the contents of the marital residence with her.

The defendant told the detective that on Monday, January 15, 2001, she stayed home to work on remodeling her new house be-

cause it was a holiday. The victim called her at about 10 a.m. saying that he missed her and wished they could be together. She went shopping at Name Brand Clothing or Home Depot but made no purchases. She then drove by the victim's residence but did not stop. At trial, she said that she stopped by the residence to pick up some articles and put clothes in the dryer. The victim told her not to bother him for a few days because he was sick and wanted to get well, and he asked her to take care of the real estate calls as they came in. She purchased a microwave at Sears at 5:27 p.m. that day, went to Walmart, and arrived home at her new house after 9 p.m.

On Tuesday, January 16, 2001, the defendant met with an employee of Drywall Basements to get an estimate on basement repairs around 10 a.m. and then drove by the victim's house on her way to a bank. The time on her bank receipt was 12:56 p.m. She went to a library and printing shop, although she did not have a receipt from either place. She purchased keys from a lock and key store at 1:36 p.m. She went to Lowe's but made no purchases there either, and she went to Burlington Coat Factory to purchase a pair of work jeans at 3:50 p.m.

She met with her visiting parents at their hotel between 4:30 and 5 p.m. The defendant and her parents subsequently drove to her new residence, passing the victim's residence on the way. Although the defendant thought it was unusual that the house appeared dark, she did not stop. Her parents stayed for about an hour, and then the defendant went to Home Depot to buy several items so she would have an excuse to stop by the victim's home. The receipt showed the transaction took place at 8:39 p.m. After being told that the 911 call was placed at 9:27 p.m., she could not recall whether she went straight to the victim's home or stopped at her new home first. At trial, she remembered that she had run back into Home Depot to look at other items. She left the victim nine voice mail messages throughout the day the victim's body was found.

The defendant was charged with premeditated first-degree murder. The State's expert witness testified at trial that the crime scene appeared to be staged to make investigators believe that the mur-

der was committed by an outside intruder during a burglary. He pointed to evidence that although numerous items of financial value had been disrupted, they were not damaged or broken. Nothing was determined to have been stolen from the residence, and things that normally are not disturbed during burglaries had been. The only items of value which were removed from the residence were a halogen light and computer speakers, which were not consistent with a burglary based on their relative values. Although an individual spent some time combining prescription pills into one bottle, it was left behind. Marijuana found on the steps in the basement appeared to have been spread out.

DNA testing revealed multiple samples of blood from the residence and the defendant's vehicle that either matched the defendant's DNA profile or would not exclude her as the known source of the sample.

The statistical probability of selection of an unrelated individual at random from the population having a DNA profile matching the blood sample of the defendant would be about 1 in 53.9 billion. The following blood samples matched the defendant's DNA profile: (1) A bloodstain found on a blanket on the bed where the victim was murdered, (2) a blood sample found on a dresser sitting inches away from the murder weapon, (3) a bloodstain on the dryer knob in the victim's residence (while a bloodstain near the dryer door handle matched the victim's DNA profile), and (4) blood on a tissue in her vehicle.

The statistical probability of selection of an unrelated individual at random having a DNA profile that could not be excluded as being a contributor to a mixture of blood or a single blood sample varied between the samples. The defendant could not be excluded as a contributor to the bloodstains in the following samples: (1) A mixture of blood from the victim and at least another person on the murder weapon (1 in 431,000); (2) blood found on the sheets and pillow where the victim was murdered (1 in 27,880); (3) blood on the dryer door (1 in 7); (4) a bloodstain on the front passenger seat of the defendant's vehicle; and (5) a tissue with biological matter found in the defendant's vehicle.

Several witnesses offered marital discord testimony indicating that the victim wanted to separate from the defendant but she was not financially capable of taking care of herself. The victim had described the defendant as crazy and as having significant mood swings where she would become violent, scream, and throw things.

Evidence was presented that the victim's mother was financially secure and had provided the couple with nearly $25,000 over the course of the year leading to the victim's death and that she gave the defendant $10,000 after the victim's death. The victim's mother was unaware of problems in the marriage. Additionally, if the defendant was acquitted of the murder charges, the defendant would have received $126,000 from the sale of the couple's real estate properties following the victim's death. The defendant also expressed frustration after she found out that she was not the designated beneficiary of the victim's retirement account balance of $103,000.

The defendant presented multiple theories of defense that someone else committed the murder or that it was drug related. Witness Nancy Pratt testified that another individual, J.S., had knowledge of the victim's murder prior to the information becoming public and had given contradictory stories about when he last saw the victim alive. Another witness, K.R., testified that she and the victim had used cocaine and methamphetamine between 1996 and 1999 and the victim had taken a trip to Pittsburg, Kansas, where another individual, M.D., lived, possibly to buy drugs.

The defendant testified that M.D. and the victim had a screaming match at the residence and the defendant was told to go and wait upstairs. Later that same fall, the victim became angry with M.D. because she had brought strangers to the victim's house. On three occasions after the murder, the defendant called the police and reported a possible intruder. Former Federal Bureau of Investigation (FBI) Agent Danny Conway testified that in his opinion, drug use places an individual in a high risk category for violence.

The defendant was convicted of premeditated first-degree murder and was sentenced to life imprisonment with the possibility of parole after 25 years. Her motions for new trial and judgment of

acquittal were denied. Additional evidence necessary to resolve the issues raised by the defendant is set forth below.

1. Exclusion of Drug—Related Evidence Relevant to Theory of Defense

Under our state and federal constitutions, a defendant is entitled to present the theory of his or her defense. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). The defendant's fundamental right to a fair trial is violated if relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense is excluded. See *State v. Mays*, 254 Kan. 479, 487, 866 P.2d 1037 (1994).

However, the right to present a defense is subject to statutory rules and case law interpretation of the rules of evidence and procedure. *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993). An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. *State v. Carter*, 278 Kan. 74, Syl. ¶ 1, 91 P.3d 1162 ( 2004).

"Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as 'evidence having any tendency in reason to prove any material fact.' K.S.A. 60-401(b). Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. [Citations omitted.]" *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 (2004).

Beyond relevance, an appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. *State v. Cordray*, 277 Kan. 43, 58, 82 P.3d 503 (2004).

The defendant argues her theory of defense revolved around the fact that the victim was a drug user who had substantial associations with known drug users in Kansas and Missouri and that this evi-

dence was relevant to prove that other persons had motive and opportunity to commit the crime and to show that one of the State's expert witnesses received incomplete information on which he based his opinion. She argues the trial court erred in excluding various drug-related evidence throughout the trial and that the cumulative effect of those errors requires reversal.

### a. Cross-Examination of State's Expert About Known Drug Associates

At trial, Alan Brantley, a supervisory special agent with the FBI, testified on behalf of the State. After previously reviewing the entire police file and visiting the residence, he opined that the crime scene was staged to divert attention away from someone who would be considered a logical suspect or was diverted from a logical motive. Part of Brantley's determination involved what the particular risk factors were to the victim of the crime.

During cross-examination, defense counsel asked Brantley if he became aware of a person, E.C., in connection with the investigation, but Brantley did not recall that name. Upon the State's objection, the defense proffered testimony that E.C. was a major drug dealer in the Kansas City area who was murdered in 1989 or 1990. At the time of E.C.'s death, P.G. was E.C.'s live-in girlfriend. P.G.'s name was found in an address book at the victim's residence, and she was also the sister of the victim's first wife. The defense argued that Brantley should have been given this information in order to appropriately assess the risk factors in his analysis. The court ruled that the probative value of the evidence was far outweighed by its prejudicial nature and the information was too remote in time.

On appeal, the defendant argues that if Brantley had been aware that the victim previously associated with known drug conspirators, including someone who was murdered, then the risk factors would have been increased, possibly affecting Brantley's total assessment of the crime scene. The defendant's argument is without merit.

Initially, a question arises concerning the relevancy of this evidence, as the defense was unable to proffer any evidence that E.C.'s murder had anything to do with the murder in this case.

However, Brantley testified that he did look at the level of the victim's participation and involvement with drugs and considered it as a risk factor. Even if this evidence was relevant to demonstrating an increase in the personal risk factors to the victim, it is unlikely that this evidence alone would have had any effect on Brantley's firm opinion that "[c]learly the level of violence and the other activity within this residence is inconsistent with a burglary for financial gain or other acquisition of property [as the crime scene was staged to appear], but it is consistent with a personal cause homicide." As this evidence seemingly would not have changed Brantley's evaluation, the trial court properly concluded that this evidence was tenuous, too remote in time, and more prejudicial than probative.

Moreover, the defendant was given the opportunity to pursue the theory of defense that the victim's drug use could have created other motives for the murder. Defense counsel extensively examined Brantley about the police department's investigation of the victim's drug dealers and the marijuana, methamphetamine residue, and drug paraphernalia found at the residence, and he elicited testimony from Brantley that drug dealers sometimes kill or beat up their customers who do not pay. Additional testimony was also presented that the victim had drugs in his home, used drugs, had arguments with an alleged drug dealer, and that the victim's drug use put him at a higher risk for violence. As such, the trial court did not abuse its discretion in excluding the proffered evidence.

### b. Cross-Examination Regarding a Name in the Victim's Address Book

The defendant's argument here is related to the previous issue. The defense asked Detective Hohnholt if she recalled defense counsel giving her the name of P.G. from the victim's address book. The trial court sustained the prosecution's objection that the issue had already been addressed by the court and told defense counsel to "[m]ove along." Defense counsel made no further argument or proffer of evidence following the court's ruling.

On appeal, the defendant argues that she was prevented from eliciting evidence that would have been valid impeachment of

Brantley's testimony and would have supported her theory of defense. However, the defendant failed to comply with K.S.A. 60-405 after the prosecutor's objection was sustained:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers." K.S.A. 60-405.

When this issue arose during cross-examination of Brantley, the defense proffered that it had given the information about P.G. to Hohnholt and that the detective was familiar with the E.C. case. However, the key issue that the defense wanted to get to—whether the detective actually informed Brantley about this possible association between the victim and P.G.—who had been convicted of being involved in a drug conspiracy with E.C., who had been murdered, was never proffered to the trial court. The defense neglected to obtain permission to ask the detective this question to make an adequate proffer. Without knowledge of how the detective would have responded, this court cannot make an adequate review of the issue and the judgment will not be set aside.

Assuming arguendo the defendant had been permitted to ask if the detective had relayed this information to Brantley, the response would not have been relevant to impeaching the agent's testimony. While Brantley testified that a search of the FBI system did not reveal any known drug associates of the victim, he also testified that he was aware that the police department had followed up on different leads regarding possible drug dealers. Although he could not remember specific names, he had taken into account the victim's drug connection as part of the risk analysis. Thus, regardless of whether the detective did tell Brantley about this particular drug connection, Brantley's testimony would not have been impeached.

Finally, as discussed in subsection (a), the trial court had already properly ruled that testimony regarding P.G. and E.C. was more prejudicial than probative because it was too tenuous and remote in time. The defendant has failed to establish an abuse of discretion

by the trial court in this ruling, and we conclude that the evidence was properly excluded.

c. Hearsay Objection Regarding the Victim's Drug Dealer Associate

Detective Hohnholt took part in the homicide investigation of the victim in this case. On cross-examination, she testified that she received contradictory statements from people regarding whether the victim used methamphetamine. Defense counsel asked if someone told her that the victim got his drugs from M.D., who lived in Pittsburg; the detective replied yes, and counsel then asked if she had investigated M.D. The State objected on hearsay grounds.

The defendant proffered that the detective had investigated M.D. and learned that M.D. was targeted by Pittsburg police for importing methamphetamine from Mexico. Once M.D.'s alibi for the time range when the victim was killed checked out, the detective conducted no further investigation. The defense argued that her investigation was not hearsay and was relevant to show that known drug associates existed who Brantley was not aware of during his risk evaluation. The State argued that the question about what someone told the detective while investigating the case was a classic example of hearsay and the defendant was offering the statement for the truth of the matter asserted. The trial court agreed and sustained the objection.

On appeal, the defendant correctly points out that the hearsay objection was ill-timed, as it is obvious that the objection was meant to refer to the previous question regarding M.D. The defendant contends that the testimony could have been admitted without hearsay and the fact that someone investigated a crime is not hearsay.

"An out-of-court declaration by a third party to a police officer which is offered at trial merely to explain the officer's conduct in the investigation of a crime, although hearsay, is usually admissible because it is not offered for the truth of the matter stated. However, when such declaration also directly incriminates the defendant, it is inadmissible unless it falls within one or more of the hearsay exceptions of K.S.A. 1992 Supp. 60-460." *State v. Johnson*, 253 Kan. 75, Syl. ¶ 7, 853 P.2d 34 (1993).

The problem in this case, however, is that the defendant did not want to explain the detective's conduct, but wanted to establish the truth of the matter that M.D. was the victim's drug dealer and that this information was not passed on to Agent Brantley to include in his analysis of the victim's risk factors. This is evident because the defendant points to Brantley's testimony that the victim's name did not show up in the FBI database as being associated with any drug dealers or informants. This "drug investigation" evidence was hearsay because it was a statement which was made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated. See K.S.A. 2004 Supp. 60-460.

Assuming that the trial court erred in sustaining the hearsay objection, the error was harmless because it had little likelihood, if any, of changing the result of the trial. See *State v. Boldridge,* 274 Kan. 795, Syl. ¶ 8, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003). Brantley testified that he had reviewed the entire police file in this case and while he could not remember specific names, he did recall that the police had investigated different leads about who was supplying the victim with drugs. Brantley was aware that the victim was involved with drugs, and he took this risk factor into account when determining if the crime scene was staged. Moreover, M.D. testified at trial, and the defense cross-examined her at length about her use of methamphetamine and handwritten correspondence with the victim in code about prices for methamphetamine. Thus, the defendant was able to enter evidence of the drug-dealing relationship between M.D. and the victim.

d. Hearsay Objection Regarding Inconsistent Statements

Defense witness Nancy Pratt testified that the victim introduced her to J.S. Pratt and J.S. had a relationship which later ended. Pratt testified that J.S. called her the day after the body was discovered and told her that Patton had been murdered, which she found significant because she did not believe that Patton's identity had been made public. She spoke with J.S. by telephone several more times that week. Defense counsel then asked, "Did he say anything about having seen Ed Patton alive?" She responded, "Yeah. He

said—," and the State objected on hearsay grounds that the defense had not indicated it was going to call J.S. as a witness.

Defense counsel argued they were not offering the statement for the truth of what J.S. said but to establish he had told Pratt different stories about the last time he had seen the victim alive. The defense proffered that J.S. told Pratt that he may have been the last person to see the victim alive because he had seen him Sunday afternoon in Prairie Village buying cold medicine. J.S. later said that he saw the victim walking across the street in front of a movie theater in Prairie Village. However, it was later discovered that J.S. was working during the time that he claimed he saw the victim. Defense counsel indicated that they had subpoenaed J.S. but were not going to call him as a witness because they believed he would not be truthful. Defense counsel argued this evidence was probative in part because J.S. appeared to know that the victim was taking cold medicine and the autopsy revealed antihistamine in the victim's system. The trial court sustained the hearsay objection.

On appeal, the defendant reiterates the argument that Pratt's conversations with J.S. were not being offered to prove the truth of the matter asserted but rather were offered to show J.S.'s inconsistent statements about the last time he saw the victim alive. The State argues the defendant was offering the hearsay statements made by J.S. to prove the truth of the matters asserted, *i.e.*, that J.S. knew much more about the homicide than reported by the media and must have been the killer.

"Hearsay is defined as an out of court statement offered to prove the truth of the matter asserted. An extrajudicial statement is inadmissible as hearsay only when offered as evidence of the truth of the matter to which it relates. If the statement is offered to show either the fact of its having been made or to prove the effect on the listener, it is admissible through the person who heard it." *State v. Smith*, 271 Kan. 666, Syl. ¶ 1, 24 P.3d 727, *cert. denied* 534 U.S. 1066 (2001).

In *State v. Vontress*, 266 Kan. 248, 252-53, 970 P.2d 42 (1998), this court held that statements made to a police officer by an unavailable alibi witness who did not testify at trial were admissible because they were not offered to prove the truth of the matter asserted, but were offered to demonstrate the inconsistencies in

Vontress' alibi statements and to explain why the detective interviewed Vontress three times the day after the murder.

The inconsistent statements in this case were relevant and being offered for two purposes: (1) To show that J.S. had extra knowledge about the murder because he knew the victim was taking cold medicine and (2) to show that J.S. had made inconsistent statements about when he last saw the victim alive. The first purpose for admitting the statements was clearly offered to demonstrate the truth of the matter stated, *i.e.*, that J.S. knew the victim was taking cold medicine, rendering it inadmissible hearsay because J.S. did not testify at trial.

However, regarding the second purpose, *Vontress* provides that evidence of inconsistent statements heard by a nontestifying witness are not inadmissible hearsay. Although the trial court in this case found the testimony was inadmissible hearsay, the court seemed to remedy the situation by permitting Pratt to testify generally that she had subsequent telephone conversations with J.S. in which he changed his stories about the last time he saw the victim alive. In this fashion, the jury was able to hear that J.S. had provided inconsistent accounts of seeing the victim prior to death without hearing the inadmissible details regarding the cold medicine. While the trial court improperly characterized the statements as inadmissible hearsay, the defense was given the opportunity to demonstrate its theory of defense that J.S. had something to do with the victim's murder. As such, we find the error was not reversible.

## 2. *Batson* Challenge

The defendant argues that the State did not provide a race-neutral reason for its peremptory strike of a person of Middle-Eastern descent during voir dire. She contends this violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79, 88-89, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

"The *Batson* analysis involves a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking

the jurors in question. In this second step, the prosecutor is only required to put forth a facially valid reason for exercising a peremptory strike to satisfy the second step of the *Batson* analysis. Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination." *State v. Washington*, 275 Kan. 644, Syl. ¶ 2, 68 P.3d 134 (2003).

Whether a prima facie showing of a racially based strike of a potential juror has been made is a question of law subject to plenary review. The trial court decision about whether the State acted with discriminatory purpose, however, is subject to an abuse of discretion standard of review. *State v. Williams*, 277 Kan. 338, 353-54, 85 P.3d 697 (2004).

The defendant raised a *Batson* challenge because the State used two of its three peremptory strikes to exclude the only two ethnic minorities on the alternate panel, a woman of Middle-Eastern descent and a woman of Asian descent. The first minority woman called was not asked any questions during voir dire. The second minority woman expressed that she was a project manager leading two major projects on a tight schedule and she hoped that those work problems would not interfere with her ability to pay attention. Regarding the first minority woman, the two prosecutors responded:

"MR. GUINN: Judge, if I may handle the record because myself and Ms. Spradling consulted with each other, most of the minorities that were on this last alternate panel in our opinion were acting very nervous in terms of their mannerisms.

"The first one that was called, the first female came up to the court's court reporter and wanted to let her know of matters that we couldn't understand.

"But it seemed to me that there was a nervousness about their participation and the process. And we are of the opinion we want strong individuals on this jury, not people who are nervous, concerned about the difficult job, and that certainly entered our decision-making process.

"I think we also had some concerns with the lady who came up to the court reporter initially, that she had difficulty with communicating. I recall from her jury questionnaire that she hasn't been in this area for a lengthy period of time, and I don't recall her speech was—

"MS. SPRADLING: It was very accented.

"MR. GUINN: It seem[ed] to be very accented.

"MS. SPRADLING: I couldn't understand her.

"THE COURT: It is the Court's opinion there were sufficient race-neutral reasons advanced by the State to exercise the peremptory [strikes] of the two minority individuals."

The defendant's argument begins with the second step of the *Batson* analysis. See *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991); *United States v. Johnson*, 941 F.2d 1102, 1108 (10th Cir. 1991) (first step becomes moot whenever prosecutor offers race-neutral explanation for peremptory challenges and trial court rules on ultimate factual issue of whether prosecutor intentionally discriminated).

The defendant argues that the State did not meet its burden of offering a facially valid race-neutral explanation for striking the potential jurors. She contends the State's only concern with the first minority woman was the possibility of language difficulties and it failed to articulate that she would not be able to understand the case or that she would need an interpreter. The defendant argues that the State's concern regarding her accented voice was a race-related reason, that nothing other than her race or ethnicity was articulated, and that the trial court made no effort to discover it.

We find this argument to be without merit for two reasons. First, aside from the first potential juror's difficulty in communicating, the prosecution expressed concern that she was displaying nervous mannerisms and acting generally nervous about participating in the trial process. Body language is a race-neutral reason to strike a potential juror. See *State v. Arteaga*, 257 Kan. 874, Syl. ¶ 5, 896 P.2d 1035 (1995). We note that other jurisdictions have upheld challenges under *Batson* where a juror acted nervous and had trouble communicating. See *Brown v. Kelly*, 973 F.2d 116 (2d Cir. 1992) (race-neutral reason that potential juror who would be foreperson was very nervous and would not be able to communicate well with the court); *People v. Staten*, 746 P.2d 1362, 1366 (Colo. App. 1987) (excluded black potential juror had limited educational background, had difficulty communicating, was extremely nervous, and did not respond adequately to questions).

Second, in *United States v Murillo*, 288 F.3d 1126 (9th Cir.), *cert. denied* 537 U.S. 931 (2002), the Ninth Circuit Court of Appeals found that a Filipino potential juror's claim that she had never

read a book and Judge Judy was her favorite TV show, coupled with her trouble communicating, were permissible grounds for a prosecutor's peremptory challenge. The court rejected the defendant's claims that difficulty communicating implies an inherent discriminatory intent, noting its holding that " '[s]o long as the prosecutor . . . can convince the district court that the potential juror who is being struck *in fact* has difficulty with English, the justification is race-neutral.' " 288 F.3d at 1136 (quoting *United States v. Changco,* 1 F.3d 837, 840 [9th Cir.], *cert. denied* 510 U.S.1019 [1993]).

The defendant in this case did not object to the prosecution's explanation that the first potential juror had approached the court reporter, had difficulty communicating, had very accented speech, and one of the prosecutors could not understand her. See *Bolton,* 274 Kan. at 18 ("[I]f the defendant or the trial court do not correct errors in statements of fact as presented by the prosecutor as reasons for exercising peremptory challenges, these facts will be considered as true for purposes of determining whether the prosecutor set forth a race-neutral reason for the strike."). The fact that this criteria might exclude other minorities who are not very familiar with the English language would not prevent this from being viewed as a race-neutral factor. See *Hernandez,* 500 U.S. at 362. "The second step does not require an explanation that is persuasive, only one that is facially valid, because that is not where the validity of the strike is considered." *Bolton,* 274 Kan. at 9. As two race-neutral reasons were supplied by the prosecution, we find the second step of the *Batson* analysis was met in this case.

It is not until the third step that the persuasiveness of the justification becomes relevant, and implausible or fantastic justifications may be found to be pretexts for purposeful discrimination. *Purkett v. Elem,* 514 U.S. 765, 768, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995). The *Murillo* court explained that a trial judge is in the unique position to determine whether a potential juror has difficulty communicating, as it is difficult to ascertain from a transcript the level of a juror's command of spoken English: "How slowly she spoke, whether she hesitated, how thick her accent was, and what her body language revealed are not recorded in a tran-

script, yet, these are aspects of communication that may be considered by the trial judge." 288 F.3d at 1136.

The defendant argues that the trial court abused its discretion by summarily ruling that sufficient race-neutral reasons were advanced by the State without inquiring of the first potential juror. The defendant cites no authority that a potential juror must be questioned by the trial court before making a determination. The trial court had the opportunity to observe the potential juror and listen to her speak to determine whether the prosecution's statements were credible, and this court gives great deference to the trial court in this area. See *Washington*, 275 Kan. at 654 (great deference is given to the trial judge under the third step because the findings turn upon evaluation of the prosecutor's credibility). Based on the reasons given by the prosecution, which were not objected to by the defense, it cannot be said that no reasonable person would have ruled in the same manner as the trial court. The trial court did not abuse its discretion in denying the defendant's *Batson* challenge.

### 3. Admission of Marital Discord Evidence

Prior to trial, the State filed a motion to allow evidence of discordant relationship. Specifically, the State sought to admit the testimony of Kelly Miles, Barry Ashner, Gwendolyn Hicks, Jan Lebow, and Dennis Hansey, as well as the victim's diary and a taped conversation between the victim and the defendant. The State argued that our courts have approved discordant relationship evidence and a defendant's previous ill-treatment of a partner as relevant in bearing on the defendant's motive and intent, noting that "Kansas decisions have found any objection based upon hearsay to be meritless. *State v. Mayberry*, 248 Kan. 369, 384, 807 P.2d 86 (1991); *State v. Wood*, 230 Kan. 477, 479, 638 P.2d 908 (1982); *State v. Phipps*, 224 Kan. 158, 160, 578 P.2d 709 (1978)."

The defendant filed a memorandum in opposition to the State's motion, arguing that the majority of the proposed evidence was inadmissible hearsay precluded by K.S.A. 2004 Supp. 60-460; that admission of the evidence violated the Confrontation Clause of the Sixth Amendment to the United States Constitution; that any state-

ments offered for a nonhearsay purpose were irrelevant to show motive or intent; and that much of the evidence concerning descriptions of the defendant's mood swings, anger, and complaints about their home did not constitute marital discord evidence. The defendant argued that the marital discord cases relied upon by the State confused relevance with the competence of a witness to know for a fact what he or she was saying was true and failed to consider a Confrontation Clause analysis. At the pretrial hearing, the defendant argued that although case law supported the proposition that in a case involving spousal homicide evidence of a discordant relationship is relevant, "that does not in any way, shape, or form answer the hearsay objection or the Confrontation Clause objection."

After the pretrial hearing, the trial court granted the State's motion to allow the evidence of a discordant relationship and adopted the reasoning set forth in the State's motion. The court held that the brief marital relationship of the parties was also admissible as res gestae, an exception to the hearsay rule. The court found that in the absence of a recognized exception, it had discretion to allow hearsay evidence if the proffered hearsay had sufficient indicia of reliability and trustworthiness.

The court also found that the third-party witnesses who would testify, based upon their proffered testimonies, did not appear to have any ax to grind or any incentive to misstate the victim's or the defendant's comments. Additionally, the court took into account the fact that the proffered witnesses' testimonies appeared consistent and relevant. The court indicated that the comments made by the defendant at the funeral showed resentment. The court further found that although the defendant had not been convicted, it had made a finding of probable cause at the preliminary hearing that she had killed her husband, thus supporting the State's contention that the victim was unavailable at the hands of the defendant. Balancing these two points, the court concluded that it was appropriate and fair to admit this evidence.

At trial, Barney Ashner testified that before the victim married the defendant, the victim confided to Ashner that he and the defendant were not getting along, that they argued a lot, that she was

crazy, and that he wanted to end the relationship and get her out of the house but she did not have a job or money. The defendant raised a continuing objection to this testimony on the grounds of hearsay and relevance and for being improper marital discord evidence as set forth during the pretrial hearing.

Daniel Waldert likewise testified that the victim consulted with him and Ashner a few months before he got married seeking advice on how to end the relationship because the defendant could not financially support herself. After the marriage, Waldert had several conversations with the victim, who relayed they were having significant marital problems. No hearsay, confrontation clause, or marital discord objections were raised to this testimony at trial.

Dennis Hansick worked in the same room with the victim and would overhear his telephone conversations with the defendant. Hansick described some of the telephone calls as stressful, causing the victim to become depressed and leave the premises. These incidents happened about twice a month. The victim confided to Hansick that his relationship was stressful and he was trying to search out a way to terminate it. The defendant did not raise any hearsay, confrontation clause, or marital discord objections to this testimony.

Gwendolyn Hendricks, the victim's cousin, had a conversation with the defendant at the victim's funeral. Hendricks remarked that the victim was such a generous person and that she was glad to see he had done so much for children. The defendant responded that the victim had done those things, but he did not have any money and had written a lot of bad checks. The defendant objected to this marital discord testimony based on the arguments previously made during the pretrial hearing.

The victim told Kelly Miles in January 2001 that he had to postpone a meeting because he was having problems with his wife having mood swings, which he described as "a Jekyll and Hyde type thing." He indicated that one moment she would be extremely loving and talking, and then in a split second she would be violent, screaming, and throwing things. He explained that he was in the process of helping her move into a rental property that he owned so they could have a break from each other. The defense's objec-

tion that this mood swing evidence was beyond marital discord and was inadmissible character trait evidence was overruled.

Susan Cortez testified that she called the victim on the evening of January 12, 2001, and asked him if he wanted to get together to catch up. He said that he did not want her to come to his house because he was afraid that the defendant would come home. Although they had been friends for 19 years, Cortez never met the defendant because the victim said she was extremely jealous. The victim agreed to meet Cortez at her office, and when he arrived, he appeared frightened and said he was afraid that the defendant had followed him to the office. He asked if they could move to an area without windows and only had a brief conversation with her before leaving. The defense objected to Cortez' testimony on the grounds that she was not disclosed as a marital discord witness. The State responded that the defense was aware of the nature of this testimony and that it was relevant to res gestae. The court admitted the evidence as res gestae because the meeting happened very close to the time of death.

Without objection, the court admitted excerpts from the victim's diary, entitled "Tyler Time Journal," which reflected his observations of the deterioration of the marital relationship and its current problems. A recording and transcript of an argument between the victim and the defendant which had occurred approximately 2 weeks prior to the victim's death was also admitted into evidence. During the argument, the defendant stated she did not love the victim, complained about their home, and said that she wanted to move to the rental home to get away from the victim.

The defendant argues that the trial court abused its discretion by admitting hearsay evidence of marital discord. The defendant contends this marital discord evidence was not relevant to prove the State's theory of the case that the defendant killed the victim for financial gain and characterizes it instead as improper character evidence of the defendant. The defendant's argument on appeal focuses on the relevance and the characterization of the marital discord evidence issues; the defendant has abandoned her hearsay and Confrontation Clause arguments raised below. See *State v. Seck*, 274 Kan. 961, 965, 58 P.3d 730 (2002) (issue not briefed on

appeal deemed abandoned). Thus, we focus our analysis on whether this marital discord evidence was relevant to the State's theory of the case or if it was improper character evidence.

An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004). Once relevance is established, the admissibility of marital discord evidence in marital homicide cases properly rests in sound discretion of trial court. *State v. Haddock*, 257 Kan. 964, 979, 897 P.2d 152 (1995).

Evidence of a discordant marital relationship is admissible to establish the relationship of the parties, the existence of a continuing course of conduct between the parties, or to corroborate the testimony of the witnesses as to the act charged. *State v. Green*, 232 Kan. 116, Syl. ¶ 4, 652 P.2d 697 (1982). "[A]s a general rule in a case of marital homicide, evidence of a discordant marital relationship and of the defendant's previous ill treatment of the spouse is relevant as bearing on the defendant's motive and intent. [Citations omitted.]" *State v. Cheeks*, 258 Kan. 581, 588, 908 P.2d 175 (1995). "[E]vidence of prior discord between a defendant and a victim does not have to rise to a violent level to be admissible." *Haddock*, 257 Kan. 964, Syl. ¶ 3.

> "Kansas courts have consistently allowed evidence of marital discord in cases involving marital homicide. Evidence of marital discord can include several types of evidence: Oral and written statements made by the deceased spouse relating their abuse; evidence of scarring, bruising, bleeding, and other physical manifestations of the abuse; testimony by others who saw the couple fighting, arguing, or otherwise in conflict; and statements by the defendant relating that he or she will kill his or her spouse. This testimony may fall under the traditional notion of hearsay or evidence of prior bad acts, yet still be admitted." *State v. Drach*, 268 Kan. 636, Syl. ¶ 7, 1 P.3d 864 (2000).

In *State v. Roberson*, 272 Kan. 1143, 1152-53, 38 P.3d 715, *cert. denied* 537 U.S. 829 (2002), this court held that Roberson's diary excerpts showing a discordant sexual relationship and his volatile emotions were powerful evidence of motive, intent, and the continuing, ongoing relationship between Roberson and the victim. This court rejected his argument that the evidence was inadmis-

sible under K.S.A. 60-447 as character traits of proof of conduct. 272 Kan. at 1152-53.

In this case, the State's theory was that the defendant murdered the victim for financial gain, staged the crime scene to make it appear as if it had been a burglary, and then portrayed their relationship as "rosy" to steer the investigation away from her as a suspect. The above described evidence, regardless of how it was admitted at trial, constituted marital discord evidence which was relevant to motive and intent. See *Drach*, 268 Kan. at 648 (irrelevant that marital discord evidence was admitted as res gestae when it was admissible on other independent grounds). All of the evidence demonstrated a continuing course of problems in the relationship and most had some connection to the financial status of the defendant. Additionally, we note that the defendant failed to contemporaneously object to the testimony of Waldert and Hansick or to the admission of the victim's diary. See *State v. Whitesell*, 270 Kan. 259, 283-84, 13 P.3d 887 (2000) (A party cannot raise an issue on appeal where no contemporary objection was made and the trial court did not have an opportunity to rule.). We conclude that the trial court did not abuse its discretion in admitting this evidence.

## 4. Admission of K.S.A. 60-455 Evidence

Three requirements must be satisfied for the admission of evidence under K.S.A. 60-455. First, the evidence must be relevant to prove one of the facts specified in the statute. Second, the fact must be a disputed, material fact. Third, the probative value of the evidence must outweigh its potential prejudice. If these requirements are met, the scope of appellate review is limited to whether the trial court abused its discretion. *State v. Moore*, 274 Kan. 639, 647, 55 P.3d 903 (2002); see *State v. Overton*, 279 Kan. 547, 551-55, 112 P.3d 244 (2005).

Prior to trial, the State moved to admit K.S.A. 60-455 evidence that the defendant had struck her previous husband, Rex Huston, in the head with a flower pot following an argument to show identity. After a pretrial hearing, the trial court found that the identity of the killer was at issue, that the victim was killed in an unsus-

pecting manner with a blunt object, and that the victim was the husband of the defendant at the time. The court further found: "The evidence pertaining to Rex Huston also suggests that Mr. Huston was also the victim of a blunt object delivered in an unsuspecting blow. The court cannot ignore that striking similarity." The court found that while the remoteness in time of the incident may affect the weight the factfinder might give the evidence, its probative value still outweighed the prejudicial value of the evidence.

At trial, Huston testified about the incident that happened when he was married to the defendant in the 1970's. After he had refused to allow the defendant to use his vehicle, he sat on the sofa to watch television. She hit him on the side of the head with a flower pot, knocking him to the floor and rendering him unconscious for a few minutes. When he woke up, the defendant and the car were gone. The defendant did not seek medical treatment or call the police.

The State correctly points out that the defendant failed to object when Huston's testimony on this issue was offered at trial. "When an unfavorable ruling on an evidentiary question prior to trial is received, a party must make a timely objection to such evidence when introduced at trial in order to preserve this issue for appeal." *State v. Lane*, 262 Kan. 373, Syl. ¶ 7, 940 P.2d 422 (1997). The defendant has not properly preserved this issue for review.

However, without deciding the question, if we were to conclude that the trial court erred in its K.S.A. 60-455 ruling, the trial court's error would be subject to a harmless error analysis.

" 'The admission or exclusion of relevant evidence in a criminal case is governed by two rules, the harmless error rule and the federal constitutional error rule. K.S.A. 60-261 sets out the harmless error rule. Error in the admission or exclusion of evidence by the court is not grounds for granting a new trial or setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. At every stage of the proceeding, the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. When reviewing the erroneous admission or exclusion of evidence, the error is harmless if no substantial right of the defendant is involved.

" 'Error in the admission or exclusion of evidence in violation of a constitutional or statutory right of a party is governed by the federal constitutional error rule.

An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that the error is harmless. Before an appellate court may declare such an error harmless, the court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. Where the evidence of guilt is of such direct and overwhelming nature that it can be said that evidence erroneously admitted or excluded in violation of a constitutional or statutory right could not have affected the result of the trial, such admission or exclusion is harmless.' " *State v. Hebert*, 277 Kan. 61, 96, 82 P.3d 470 (2004) (quoting *State v. Sanders*, 258 Kan. 409, 418-19, 904 P.2d 951 [1995]).

Applying this dual test, it is clear that the admission of the altercation between the defendant and her ex-husband was not inconsistent with substantial justice, did not affect the substantial rights of the defendant, and had little, if any, likelihood of changing the results at trial. As the evidence of guilt in this case was overwhelming, this court can declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the result at trial and was thus harmless.

5. Admission of Expert Testimony Regarding Crime Scene

Agent Brantley testified about his background and qualifications at trial. He had been employed with the FBI for 19 years and was currently the supervisory special agent assigned to the National Center for the Analysis of Violent Crime in the Behavior Analysis Unit. He had an undergraduate degree in psychology, a master's degree in psychology and counseling, and had also done post-masters work. Prior to working for the FBI, he was a psychologist with the North Carolina Department of Corrections for 6 years. He worked as an FBI field agent for 6 years and had been on the faculties of the FBI Academy of the University of Virginia, Virginia Commonwealth University, and Walter Reed Army Medical Center teaching in the areas of violent crime, homicide investigation, assessment of violent crime scenes, assessment of deaths and dangerousness, youth violence, and terrorists.

Brantley has gone through specialized training at the behavior analysis unit on the topics of violent crime scene analysis, homicide investigation, and violent criminal behavior. The purpose of criminal investigative analysis is to provide information to investigators,

attorneys, mental health professionals, and jurors about violent crime behavior that usually goes beyond the personal and professional life experience of those individuals. At the time of trial, he was a member of the International Homicide Investigators Association, Harvard Associates in Police Science, the Association of Threat Assessment Professionals, the International Association of Criminal Investigative Analysis Fellowship, and he had testified as an expert in this field in the United States and Canada.

Prior to trial, the trial court denied the defendant's motion in limine to exclude Brantley's testimony that the crime scene was staged or orchestrated. The defense reasoned that Brantley's opinion had no basis in a scientifically valid methodology that has gained general acceptance in a relevant scientific community, the opinion was not within the scope of his special knowledge, skill, experience, or training under K.S.A. 60-456(b)(2), and his opinion would not be helpful because it was within the jury's realm of experience and common knowledge to assess the photographs of the crime scene and decide if it had been staged. During arguments on the motion, defense counsel conceded to the trial court's ruling that Brantley's testimony was not subject to the standards set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The trial court denied the motion, reasoning:

"THE COURT: Having considered his testimony at the preliminary hearing, it is the Court's opinion that the factual issues with respect to the staged crime scene are such that they are beyond the scope of common experience of most people, and I think it would be of an aid to the jury to have testimony on this. His testimony and expert opinions are pure opinion. I don't believe these are subject to *Frye* standards. There is no scientific or any testing that would be subject to the *Frye* doctrine as I recall his testimony. It is just—

. . . .

"THE COURT: I think it is a matter of his application of his specialized training to the facts and the opinions that the offers of the pure opinion kind. So I think it meets the standard under our rule to allow expert opinion of that kind. He, of course, will be tested by cross-examination and counsel has leeway in rigorous examination."

On appeal, the defendant takes issue with the following exchange which took place during direct examination of Brantley:

"Q. What is meant by personal cause homicide? What is meant by that?

"A. Well, personal cause homicide is basically a homicide where the victim is the focus of the offender, could be motivated by anger, revenge, financial gain, or the removal of an obstacle to a goal.

"Q. And how do you attach that personal cause homicide label to this case? Is there such a situation going on here?"

The defense objected, arguing that Brantley was only qualified to talk about staging and not about motive. The State agreed to move on to another area but then immediately asked, "Based upon your expertise and your understanding of this crime scene what appears to be the primary motive of the offender in this instance?" The defense raised the same objection, which was overruled by the trial court. Brantley responded:

"A. As I said earlier, what's the main focus here? For us in the beginning was do we have a burglary that's gone bad and a burglary that started out being motivated by financial gain or the theft of property, or do we have a personal cause homicide, once again where the victim was the focus of the offender's interest. Clearly, the level of violence and the other activity within this residence is inconsistent with a burglary for financial gain or the acquisition of property, but it is consistent with a personal cause homicide. Again, the level of·violence goes way beyond [what would be necessary] to commit a burglary or even escape if you are confronted by the occupants or homeowner and that more than anything goes right to the motive here."

The defendant acknowledges that trial counsel conceded at the motion hearing that Brantley's testimony was pure opinion as it related to the staging of a crime scene and was not subject to *Frye*. However, she contends the issue is bifurcated and that the trial court did not consider whether Brantley's testimony relating to *motive* was subject to the *Frye* test. In the alternative, she contends the testimony did not bear sufficient indicia of reliability.

The admissibility of expert testimony is subject to K.S.A. 60-456(b), but the *Frye* test acts as a qualification to the K.S.A. 60-456(b) statutory standard. *Frye* is applied in circumstances where a new or experimental scientific technique is employed by an expert witness. *Frye* requires that before expert scientific opinion may be received into evidence, the basis of the opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. See *Kuhn v. Sandoz Pharmaceuticals Corp*, 270 Kan. 443, 454, 14 P.3d 1170 (2000).

The *Frye* test does not apply to pure opinion testimony, which is an expert opinion developed from inductive reasoning based on the expert's own experiences, observations, or research. The validity of pure opinion is tested by cross-examination of the witness. See *Kuhn*, 270 Kan. at 457. The distinction between pure opinion testimony and testimony based on a scientific method or procedure is rooted in a concept that seeks to limit application of the *Frye* test to situations where there is the greatest potential for juror confusion. *Kuhn*, 270 Kan. at 460.

"The distinction between pure opinion testimony and testimony relying on scientific technique promotes the right to a jury trial. Judges generally are not trained in scientific fields and, like jurors, are lay persons concerning science. A Kansas jury has a constitutional mandate to decide between conflicting facts, including conflicting opinions of causation. Kansas Constitution Bill of Rights, § 5; see K.S.A. 1999 Supp. 60-238. The district judge under K.S.A. 60-456(b) controls expert opinion evidence that would unduly prejudice or mislead a jury or confuse the question for resolution. Cross-examination, the submission of contrary evidence, and the use of appropriate jury instructions form a preferred method of resolving a factual dispute." 270 Kan. at 461.

While the admission of expert testimony is subject to an abuse of discretion standard, the determination of whether the *Frye* test was correctly applied is subject to de novo review. *Kuhn*, 270 Kan. at 456.

The defendant argues Brantley's testimony regarding the motive behind the staged crime scene was scientific expert testimony which was not generally acceptable within the scientific community under *Frye*. In the alternative, she contends this type of behavioral analysis does not bear sufficient indicia of reliability. With little argument, the defendant cites *State v. Stevens*, 78 S.W.3d 817 (Tenn.), *cert. denied* 537 U.S. 1115 (2002). In that case, the Tennessee Supreme Court held an expert FBI agent could testify about the staging of the crime scene but prohibited him from testifying about the probable motive of the criminal by analyzing the evidence found at the crime scene. Although this testimony was based on nonscientific specialized knowledge based on the expert's experience, the court found that it still must meet the fundamental requirements of relevance and reliability, as described in *McDaniel*

*v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 [1993], and its factors).

The Tennessee court looked at these *Daubert* factors, the expert's qualifications for testifying on the subject at issue, and the straightforward connection between the expert knowledge and the basis for the opinion and concluded that the trial court properly excluded such testimony. Relevant to this case, the court explained:

"This type of crime scene analysis, developed by the FBI as a means of criminal investigation, relies on the expert's subjective judgment to draw conclusions as to the *type of individual* who committed this crime based on the physical evidence found at the crime scene. Although we do not doubt the usefulness of behavioral analysis to assist law enforcement officials in their criminal investigations, we cannot allow an individual's guilt or innocence to be determined by such 'opinion evidence connected to existing data only by the *ipse dixit*' of the expert. Essentially, the jury is encouraged to conclude that because this crime scene has been identified by an expert to exhibit certain patterns or telltale clues consistent with previous sexual homicides triggered by 'precipitating stressors,' then it is more than likely that this crime was similarly motivated. [Citation omitted.]" 78 S.W.3d at 835-36.

In contrast, similar expert testimony was admitted in *Simmons v. State*, 797 So. 2d 1134 (Ala. Crim. App. 1999). In that case, the Alabama Criminal Court of Appeals held that an FBI agent's testimony that the crime scene indicated the offense was sexually motivated was admissible. The court found this was not profile testimony that identified the defendant as having characteristics of one likely to commit the offense but rather was testimony that the physical evidence of the crime indicated certain characteristics of the offense. The court concluded that this testimony was not governed by *Frye*; rather, crime-scene analysis was specialized knowledge to which the rule governing the admissibility of expert testimony applied:

"Crime-scene analysis and victimology do not rest on scientific principles like those contemplated in *Frye*; these fields constitute specialized knowledge. Specialized knowledge offers subjective observations and comparisons based on the expert's training, skill, or experience that may be helpful to the jury in understanding or determining the facts. Crime-scene analysis, which involves the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge. [Citations omitted.] Therefore, because crime-scene analysis is not

scientific evidence, we conclude that we are not bound by the test enunciated in *Frye*. [Citation omitted.]" *Simmons*, 797 So. 2d at 1151.

The court ultimately concluded that the evidence was reasonably likely to assist the jury in understanding and in assessing the evidence, since the matter at issue was highly material, relevant, and beyond the realm of "acquired" knowledge normally possessed by lay jurors. 797 So. 2d at 1156-57.

We distinguish our case from both *Stevens* and *Simmons* because they do not recognize pure opinion testimony as discussed by this court in *Kuhn*. In this case, Brantley's analysis of the crime scene was intertwined with his opinion as to how he characterized the motive of the crime. The crime scene was made to appear as if the victim was killed as part of a burglary gone bad; however, the agent quoted statistics that burglary was a contributing circumstance to murder in only 72 out of over 2 million burglaries in the United States during 2000. The motive of the killer, in a personal cause homicide rather than a burglary, was a relevant factor to consider in determining whether the crime scene was staged. As noted in *Simmons*, the agent's testimony was simply that the physical evidence of the crime indicated certain characteristics of the offense. The agent did not note any special scientific technique in making this determination, and it was different from the type of scientific evidence that is usually subject to the *Frye* test. See *Kuhn*, 270 Kan. at 460-61. As this pure opinion testimony was part and parcel of the crime scene analysis, we conclude that it was not subject to the *Frye* test.

Although the defendant challenges the reliability of this evidence, the defendant ignores the trial court's determination that Brantley's testimony was pure opinion testimony. It is clear from the evidence presented regarding the crime scene analysis that this testimony was based on specialized knowledge that would not be familiar to a lay person, as it was knowledge which the agent had gained through extensive specialized training through the FBI. Expert opinion testimony is admissible if it aids the jury with unfamiliar subjects or interpreting technical facts or if it assists the jury in arriving at a reasonable factual conclusion from the evi-

dence. *State v. Leitner*, 272 Kan. 398, 418, 34 P.3d 42 (2001). Once the trial court makes this determination, the validity of pure opinion testimony is challenged by cross-examination. See *Kuhn*, 270 Kan. at 456. The trial court did not abuse its discretion by admitting this testimony.

### 6. Judicial Misconduct

As discussed previously, Nancy Pratt testified for the defense that J.S. called her the day after the victim was found dead and told her about the murder before that information had been made public. J.S. subsequently told· Pratt conflicting accounts of when J.S. had last seen the victim alive. On cross-examination, the following exchanges occurred between the judge, the witness Pratt, and a spectator (Pratt's daughter) in the gallery:

"Q. [Prosecutor]: He had a couple different attorneys, didn't he?

"A. [Pratt]: I believe so.

"THE COURT: Excuse me. Excuse me. Ma'am, if you [the spectator] want to testify in the case I'm sure the defense lawyers will give you the opportunity,.but you're not going to communicate with the witness.

"SPECTATOR: I'm not communicating.

"THE COURT: You are and I'm not—

"A. [Pratt]: Let me answer the question.

"THE COURT: I'm not going to tolerate it. If you do it again, you're out of my courtroom.

"SPECTATOR: I'll just get out. This—

"THE WITNESS: She was—

"THE COURT: She was communicating with her.

"THE WITNESS: I wasn't communicating. She got it all—

"THE COURT: We are going to take a recess for about 10 minutes."

During the recess, the witness Pratt repeatedly told the court that the spectator was her daughter and she was not doing anything, but the judge responded that he did not want to talk to Pratt, told her to be quiet, and threatened her with contempt. The spectator, Abby Pratt, was brought back into the courtroom and repeatedly told the court that her intentions were not to communicate with her mother, but the judge insisted that she was communicating with the witness and warned her that he did not like her attitude and that she could be put in jail. Defense counsel

explained that Abby was holding her mother's car keys and Pratt was concerned that Abby would leave with the keys.

Defense counsel argued that when Pratt was on the witness stand and denied that she and her daughter were communicating and the court took issue with that statement in front of the jury, it was "almost a comment on credibility from the Court to the jury . . . against her and she loses." The court advised that it would give a limiting instruction and denied the defendant's motion for mistrial because no prejudice had been shown. Upon the jury's return, the judge stated: "Ladies and gentlemen, let me just briefly advise you that the discussion the Court had with the member of the gallery previously is not a matter for your concern. It should not affect the issues in the case, and you should disregard it for your purposes here as factfinders."

At trial, the defense took issue with the judge's comments as part of its motion for mistrial, which is reviewed under an abuse of discretion standard. See *State v. Abu-Fakher*, 274 Kan. 584, Syl. ¶ 7, 56 P.3d 166 (2002). In her posttrial motion and on appeal, the defendant argues that the trial judge's remarks prejudiced her right to a fair trial, an issue which is subject to unlimited review. The party alleging judicial misconduct bears the burden of showing his or her substantial rights were prejudiced. *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002). Furthermore,

"[a]llegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. Mere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial. [Citations omitted.]" 274 Kan. at 118.

The defendant argues that the trial court's comments to the spectator and its contradiction of the witness' statement in the presence of the jury cast doubt upon Pratt's credibility and prejudiced the substantial rights of the defendant. She reasons Pratt provided important testimony that another person had knowledge of the murder before that information had been released to the public.

The defendant contends that the comments were even more egregious because the court stopped the entire progression of the trial and had a heated discussion with the spectator before contradicting the witness. She alleges the manner in which the court handled the situation reflected negatively on her defense and notes that the limiting instruction did not refer to the court's comments to the witness.

Although the exchanges between the judge, the witness, and the spectator became more heated after the jury was excused, careful review of the relevant exchange that occurred in front of the jury reveals that while the judge clearly contradicted the credibility of the spectator, the judge did not contradict the witness. Pratt interjected herself into the exchange between the judge and the spectator and only got out, "She was—," when the judge said, "She was communicating with her." The defendant has acknowledged that "she" refers to the spectator. The judge's response was not a contradiction. *The witness,* not the judge, then pressed the issue and argued, "I wasn't communicating. She got it all—," before the judge announced a recess.

When considering allegations of judicial misconduct, "[w]here a construction can properly and reasonably be given a remark which will render it unobjectionable, the remark will not be regarded as prejudicial." *State v. Plunkett,* 257 Kan. 135, Syl. ¶ 1, 891 P.2d 370 (1995). As demonstrated above, the trial court's remarks can clearly be construed as referring to the spectator rather than Pratt's credibility. As the trial court did not make any comments in front of the jury that reflected negatively on the witness' credibility, no limiting instruction on this issue was required. Further, we think it very likely that the jury assumed that the limiting instruction given covered the brief interjections by Pratt during the exchange between the judge and the spectator.

While the better practice would have been for the trial court to dismiss the jury as soon as the spectator disagreed with the court, this error alone did not rise to the level of prejudicing the defendant's substantial rights, especially when a limiting instruction was given and the judge's comments had nothing to do with any evidence or testimony in the case. See *Plains Transport of Kansas,*

*Inc. v. Baldwin*, 217 Kan. 2, 10, 535 P.2d 865 (1975) (finding substantial rights of party not violated by judicial misconduct in part because jury was warned not to consider such remarks in reaching its decision). We conclude that the trial judge did not deny the defendant a fair trial by those comments.

## 7. Character Impeachment

The defendant argues the trial court erred by permitting the State to cross-examine Nancy Pratt regarding specific instances of her character relating to truthfulness and her alleged litigiousness.

During cross-examination, the State elicited testimony from Pratt about the details of a pending lawsuit she had filed against J.S. with whom she had a previous relationship. The State asked Pratt if she had made accusations against two different ex-husbands concerning physical abuse and threats. It pointed out that she had filed two separate protection from abuse petitions which had not been supported by a preponderance of the evidence in an attempt to draw an analogy that she made serious allegations against men that she had been previously involved with which were untrue. Defense counsel did not object to this line of questioning.

Following the incident with the spectator described in the previous issue, the State asked Pratt if she had granted J.S. a power of attorney during her second divorce proceedings. The State offered evidence of correspondence she had written to District Judge Larry McClain during the divorce indicating that she had made such an appointment. The State asked if she had filed a petition to have her husband held in contempt of court indicating that he had violated the conditions of a no-contact order and setting out J.S.'s name in support of her contentions. The State asked if Judge McClain had heard the motion for contempt and found against her. At this point, defense counsel objected, and the following exchange took place before the objection was overruled:

"MR. ROGERS [Defense counsel]: Your Honor, might conceivably go to this witness' credibility when these allegations were made and [J.S.] was listed as a potential witness. Certainly does not have anything to do with her credibility in this case or anything else what Judge McClain decided on some pleading and some unrelated case.

"MR. GUINN [Prosecutor]: Judge, I think it has every bearing. She is suggesting that [J.S.] somehow is involved in this murder. And the fact that she used him, as giving him the power of attorney, and has indicated he is going to support her allegations in the contempt proceeding against her husband in the State's view suggests that she is not credible in terms of suggesting [J.S.]'s involvement in this case.

"MR. ROGERS: What does that have to do with Judge McClain's?

"THE COURT: I think it impacts credibility. Her credibility is fair game.

"MR. ROGERS: All the—with regard to Judge McClain's ruling, he found inferentially, inferentially found. Maybe he found her not to be a credible witness. And that is improper to show this witness was shown not to be believed in some other case. We can't cross-examine every police officer that testifies for State in this case where the defendant was acquitted."

The trial court overruled the objection. On further cross-examination, Pratt explained that the motion for contempt in her divorce proceeding was never heard and the judge dismissed the case before it came before him.

As noted by the State, the defense failed to object to virtually any of the testimony that it takes issue with on appeal. Without a contemporaneous objection, these character issues were not properly preserved for review. See *State v. Clemmons*, 273 Kan. 328, 344-45, 45 P.3d 384 (2002). As demonstrated above, the only issue preserved for appeal was whether the trial court erred by permitting the State to attack her credibility by asking whether Judge McClain denied her motion for contempt in her divorce proceeding.

The defendant argues the State's use of a specific instance of Pratt's conduct from a previous court case to impeach her character was prohibited by K.S.A. 60-422, which provides in relevant part:

"As affecting the credibility of a witness . . . (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; [and] (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

In *State v. Smallwood,* 223 Kan. 320, 326-27, 574 P.2d 1361 (1978), the defendant sought to attack a witness' credibility by cross-examining him about his testimony under oath at two preliminary hearings where he admitted that he had not told the truth. In interpreting K.S.A. 60-422(c) and (d), this court held:

"[A] witness' credibility may be attacked by showing the witness has character traits for dishonesty or lack of veracity, but those traits may only be proven by opinion testimony or evidence of reputation. Those traits may not be proven by specific instances of the witness' past conduct. [Citations omitted.] Since the two episodes concerning [the witness'] prior testimony were nothing more than prior specific instances of his conduct, the trial court properly prevented the appellant from inquiring about them on cross-examination by applying the exclusionary rule provided in K.S.A. 60-422(d)." 223 Kan. at 326-27.

In this case, Pratt's allegations in a prior contempt proceeding which were never proven to be true constituted a specific instance of conduct that the State improperly used to impeach her credibility. The trial court abused its discretion by admitting this line of questioning.

However, our review of the admission of evidence in this case is further subject to a harmless error analysis. No error in either the admission or the exclusion of evidence is a ground for granting a new trial or for setting aside a verdict unless the refusal to take such action appears inconsistent with substantial justice. K.S.A. 60-261; *State v. Villanueva*, 274 Kan. 20, 31-32, 49 P.3d 481 (2002).

In response to the improper questioning, Pratt testified that the contempt proceeding was dismissed before she had an opportunity to present her case or say anything to Judge McClain. Pratt's response prevented the State from suggesting that her testimony in this case was not credible since the other court had not found Pratt not credible. Thus, it is unlikely that this line of questioning about her previous contempt proceeding being dismissed had much effect on her credibility, especially in light of the much more damaging testimony that Pratt had ended a relationship with J.S. and was currently involved in a lawsuit with him. Further, we note that the bulk of the evidence supporting the defendant's conviction was not provided by Pratt, and attacking the credibility of her testimony does not diminish all of the other relevant evidence. See *State v. Cordray*, 277 Kan. 43, 58, 82 P.3d 503 (2004). Although the trial court abused its discretion by admitting this character testimony, we conclude that the error was not inconsistent with substantial justice, did not affect the substantial rights of the defendant, had little, if any, likelihood of changing the results at trial, and was thus harmless beyond a reasonable doubt.

## 8. Testimony Regarding Cuts on the Defendant's Hands

On direct examination, Detective Hohnholt testified that she observed several cuts on the defendant's hands during the early morning hours after the victim's body was found. The State asked if they appeared to be recent or fresh cuts, and she replied, "I didn't personally get close enough to tell, but they appear[ed] to be recent." Defense counsel said, "Object to that. And she couldn't tell, how does she get to give opinion." The court overruled the objection, telling defense counsel that he could cross-examine the witness.

On cross-examination, the detective indicated that the defendant had told her these injuries were caused when she was sanding cabinet doors and other things she was working on at the new house. In a subsequent interview, the defendant told the detective that she cut herself with a razor blade in a failed suicide attempt. Defense counsel asked if they were fresh bleeding cuts, and the detective responded, "I did not see any blood. But, again, I was close enough to observe them, but I did not look real close up at the hands."

The defendant argues the trial court abused its discretion by permitting Hohnholt to testify that the cuts on the defendant's hands appeared recent because an inadequate foundation had been laid that she was qualified to give such testimony. The State cites authority that a witness need not be an expert on blood in order to testify that fresh marks and spots on the defendant's hands and clothing were caused by blood. See *Lightner v. State*, 195 Ala. 687, 71 So. 469 (1916).

As evidence that the defendant had cuts on her hands was clearly relevant, our first consideration when examining appellate challenges to the admission of evidence, this court moves on to consider whether the admission of such evidence constitutes an abuse of discretion. Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. See *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004); *State v. Kendall*, 274 Kan. 1003, 1012, 58 P.3d 660 (2002).

K.S.A. 60-456(a) provides that a nonexpert witness may testify to his or her opinions or inferences that the judge finds "(a) may

be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony." K.S.A. 60-456(b) provides that if the witness is testifying as an expert, his or her opinions and inferences are limited to those that the judge finds are "(1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

It should first be noted that defense counsel did not object to the testimony on foundation grounds; rather, the defendant was objecting on the grounds that the detective could not get close enough to tell if the cuts were recent. "A defendant may not object to the introduction of evidence on one ground at trial and then assert a different objection on appeal. [Citation omitted.]" *State v. Edwards*, 264 Kan. 177, 199, 955 P.2d 1276 (1998). Nevertheless, we will consider the issue.

The defendant relies upon *State v. Loudermilk*, 221 Kan. 157, 163, 557 P.2d 1229 (1976), in which a detective testified that he observed what he believed were "needle marks" on the defendant's arms and opined that some of the marks were "fresh tracks." He had no medical training but had read material provided to law enforcement officers by the Bureau of Narcotics and Dangerous Drugs, had worked many heroin cases, had been an undercover agent for 2 years, and had observed similar marks on the arms of 40 to 50 people. On appeal, this court found the "expert" opinion testimony was proper, reasoning:

"Here the witness testified to what he observed and little more. *Whether a small wound is a cut or a puncture, and whether it is old or new, would not appear highly technical.* Be that as it may, the witness had some experience and training in the area about which he was testifying and we cannot say that the trial court abused its discretion in the admission of the testimony." (Emphasis added.) 221 Kan. at 163.

The defendant highlights the fact that the *Loudermilk* court deemed it necessary to find the proper foundation for the detective's testimony had been laid, despite its finding that the determination of whether a cut is old or new is not highly technical. However, it is important to note that the *Loudermilk* court may

have gone on to make this determination because evidence of the detective's expert qualifications had been presented to the trial court. In this case, as the defendant did not object on foundation grounds, the State never identified whether it was seeking to offer the detective's opinion as expert or lay opinion and no foundation for expert opinion was presented. The defendant assumes that the testimony was offered as expert opinion in arguing that it was not within the scope of the special knowledge, skill, experience or training possessed by the detective. See K.S.A. 60-456(b)(2).

However, by way of comparison, we have found it was acceptable for an officer to offer either lay or expert opinion testimony under K.S.A. 60-456 that someone appeared to be intoxicated. See *Kendall*, 274 Kan. at 1013. In insanity cases, lay testimony·was permissible concerning the defendant's sanity at the time of committing the crime if the opinion was rationally based on the witness' perception and was helpful to a clearer understanding of his or her testimony. See *State v. Alexander*, 240 Kan. 273, 274, 729 P.2d 1126 (1986); *State v. Shultz*, 225 Kan. 135, Syl. ¶ 1, 587 P.2d 901 (1978) (Nonexpert witnesses who are shown to have had·special opportunities to observe may give opinion evidence as to sanity.).

If lay opinion testimony can be given as to observing signs of something more subjective such as intoxication or sanity, it reasonably follows that testimony as to whether a cut appears to be fresh or healed is something that a nonexpert witness who observed the wounds could describe since the determination of whether a cut appears to be fresh or healed is not highly technical. See *Loudermilk*, 221 Kan. at 163. Therefore, we cannot say that no reasonable person would have admitted this testimony, and the trial court did not abuse its discretion by its admission of this evidence.

## 9. Cumulative Trial Error

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial." *State v. Plaskett*, 271 Kan. 995, Syl. ¶ 4, 27 P.3d 890 (2001). No prejudicial error may be found based on cumulative error if the evidence

is overwhelming against the defendant. *State v. Hebert*, 277 Kan. 61, 106, 82 P.3d 470 (2004).

The defendant argues that the collective errors committed by the trial court denied her the right to a fair trial. Based on the above analysis, we conclude the trial court committed error by excluding Pratt's specific testimony about J.S.'s conflicting stories as inadmissible hearsay and by allowing improper impeachment of Pratt's credibility. However, the defendant did not properly preserve the K.S.A. 60-455 issue for appeal, and the errors surrounding Pratt's testimony constituted harmless error as discussed above.

Nevertheless, we conclude that the evidence presented at trial makes it unlikely that those errors had any effect on the outcome of the trial. The evidence showed that the residence had been deliberately staged to look like a burglary; that DNA testing definitively placed the defendant's blood at the crime scene, near the murder weapon, on the dryer, and in her car; that she had fresh cuts on her hands when interviewed by police; and that the couple had a history of marital discord often related to finances, where the defendant was portrayed as "a Jekyll and Hyde." In light of this overwhelming evidence, the defendant was not denied a fair trial based on these harmless errors.

Affirmed.